MARTIN G. IMBACH, INC. *v*. TATE, TO HIS OWN
USE AND USE OF STATE ACCIDENT FUND

[No. 40, October Term, 1953.]

*Decided December 8, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Donald N. Rothman,* with whom were *Gordon & Feinblatt* and *A. Frederick Taylor* on the brief, for appellant.

*Amos I. Meyers* and *Michael Paul Smith,* with whom was *W. Lee Harrison* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment on a verdict for injuries claimed to have been sustained by the appellee when struck by a falling pier shed.

The pertinent facts of the case follow. Mutual Chemical Company owned a pier at the foot of Philpot Street in Baltimore, which was covered by a roof or shed. This pier had been leased to the Miller Chemical Company, which had been using it for the storage of bags of fertilizer and manure. The appellant, Martin G. Imbach, Inc., entered into a contract with Mutual to remove the roof or shed from the pier because of its bad condition. On May 15, 1951, appellant sent a crew of workmen on a five hundred ton barge carrying a "whirley derrick" and a power winch to tear down the shed pursuant to the contract. William D. Jones was the foreman of this crew and had been employed by the appellant since 1943. He had worked on the waterfront for twenty-five years doing pile driving work. He had worked under a foreman in taking down the roof on the pier of the Miller Chemical Company in 1922. Apparently this was the only demolition work he had ever done on such a shed. He said the Miller pier was better constructed than the Mutual pier in this case. Appellant's superintendent did not go to the scene of the work as he was engaged on another job. He relied on Jones' judgment as to the proper way to do the work. This was the first time Jones had been sent out with equipment and a "gang" to tear down the roof on a pier or to do work like this. The only instruction Jones received was a paper, given him by the timekeeper, which contained the name of the man he was supposed to see at the Mutual pier. The barge, 116 feet long, arrived at the pier shortly before noon and was moored on its left side about thirty-five feet from its water end. It was not moored tight against the pier. There were no fender piles or cluster of piles to keep the barge from striking the pier or to decrease the shock produced by

the barge striking the side of the pier. The winch was located in the middle of the barge on the side next to the pier. The top of the deck of the barge was from eighteen to twenty-four inches above the top of the pier. Jones then went to see a Mr. Rogers, whose name was on the paper. He said he and two other men from his crew walked around and looked at the shed. Jones said the roof was in such bad condition that it would not hold a man. This shed was erected in sections of "bays", sixteen feet apart. The sections extended sixteen feet from column to column. These sections, each sixteen feet, covered the entire length of the pier. The sheathing on which the roof was placed was put on without regard to these sections. The sheathing boards were six or eight inches wide and ran cross-wise. The purlins or horizontal timbers supporting the rafters ran longitudinally. Therefore the roof was not in sections, but constituted one roof over the entire shed. Jones and his crew decided to remove the shed section by section, working from the water end to the shore. This was to be done by removing the supporting columns of each succeeding section and, if the roof over a section failed to drop, it was to be pressed down by weights. The power for removing the columns was to be applied by a cable running from the power winch on the barge which was manned by Jones.

Four men of the crew were put on the pier to attach the cable to the columns. The cable was attached to the first two columns running along the end of the pier, after these had been chopped more than half way through with an axe. Jones stated that these columns or posts were cut halfway through to lessen the pull. He said: "We were scared of the building in the first place." He also said that at least one of these columns was loose and was not supporting the roof. He applied the power to the winch. The four men stepped back under the next bay and each of these columns came out easily and fell on the deck of the pier. The third column, located in the middle, was chopped and the cable attached to it

and the men walked back. Jones said no power had been applied to this third column when the whole roof fell toward the left side of the pier, next to the barge, breaking all of the columns on that side of the pier near the base. The columns on the other side, away from the barge, were all erect. Clarence C. Edward Johnson, an employee of the appellant for approximately five years and one of the men hooking the cable to the third column, said that after the cable was hooked they walked back toward Philpot Street and Jones applied the power to the winch, but the column did not come loose. The steam was then applied to the winch. The throttle was opened up again to get a stronger pull on the cable. The cable was "snatched" and the whole roof fell down over the whole pier. Trapped under the roof were Johnson and the other three employees of appellant and several of Miller's employees, including Tate, the appellee here, who had been moving the fertilizer bags out of the shed. Jones admitted that he had seen at least six men under the shed where the fertilizer bags were located. These bags were located about even with the stern of the barge. Mr. James Halfpenny, foreman for Miller, testified that his superintendent, Mr. Fisher, told him about 12:30 P.M. to go over on the wharf with his five men and gather up the fertilizer material and bring it in because they were going to tear the shed down. He said he and his men received no warning other than the statement by Mr. Fisher that "they were going to tear the shed down".

Mr. Charles Collison, produced by the defendant, testified that he was president of a wrecking company, which demolished structures and buildings and had been engaged in that work for sixteen years. He saw the pier here in question one week previous to the accident, when he went down to bid on the job of removing this shed. He did not bid on the job because he had no marine equipment. He walked out on the pier and examined the structure as a whole. He said there were only three methods of taking down a roof on a pier, which

is well recognized among wreckers. The first method would be to put a man on the roof and tear it down. The second method would be to bind a section of the roof with cables and then lift it over, and the third method was the method used by the appellant in pulling the supports from under the roof and dropping it in sections. He said he would have used the third method because the roof was so far deteriorated that "you would not put men on it". He thought the second method was the most dangerous. He would have expected the roof to fall in bays or sections and would have used the same method used by the appellant. When asked the question, if he had hooked on the support and pulled, and the roof did not come down, would he have given it a harder pull, he answered that he would. When asked whether he would have taken a chance on the whole roof caving in, he answered: "Your Honor, I don't want to disagree but I do not believe that pulled the roof over. If it had, your water section of the roof would have turned, it would be twisted. If you were to pull it naturally, it would have a twist of the roof. I have seen a hundred or more fall." He further said it was common practice for contractors or wreckers to proceed with men working beneath the roof. On cross-examination, he was asked the question: "You remember there were two extra hard pulls with extra steam, take that into consideration, and any other factors, that they were supposed or expected as experts, as they held themselves out, the Imbach Company, when they sent their gang of men down there to the job, take that into consideration, wouldn't that jar cause the building to shake?" He answered: "Oh, sure, any jar would cause the building to shake." He said all three methods of wrecking were dangerous and wrecking insurance is the most hazardous insurance written. The industry is dangerous. When asked: "With people under the roof, of course, you have that element of danger at all times?" He answered: "At all times is right, sir, wherever you start a wrecking job you have that element of danger."

Mr. Henry Hagel, a consulting engineer registered in the States of Maryland and Florida and called as a witness by the defendant, testified that he was a specialist in all types of industrial structures, such as piers. He was sent by the president of appellant corporation to the pier here in question the day after the accident occurred. He said the shed fell toward the "whirley" and in his opinion something had affected the columns on that side which caused the roof to fall because the columns on the remaining side were standing. When asked his opinion of what caused the roof to fall, he said: "The pier fell toward the derrick; something had struck the bottom of these columns which knocked the lower part in causing the upper part to fall outward and thus dropping the top, the roof, * * *" The Court: "What was that something?" He answered: *"That, from the observation of the site, a long derrick is the only thing that could hit this simultaneously and knock the columns down * * *."* He thought the pulling of the third column would not have caused the roof to fall. That, if it had, it would have fallen in a southerly direction, because the columns on the east side were all erect. He said this whirley derrick, which was about eighteen to twenty-four inches above the top of the deck, could hit against the columns. He further said: "A normal procedure is to have piling outside of the pier to protect anything from rubbing against the pier. On this particular pier there were no fender piles, nor clusters of piles, to prevent anything from breaking against the pier. If you look at most piers they have this particular protection." The Court: "That is something a person should anticipate is liable to happen that would park a big thing like this along side of the pier." Witness: "Well, I might say they might and then again you might think of the condition it has been used for a number of years, boats, barges and other things, other vessels alongside of the pier." He further testified that it was perfectly reasonable and proper to take this roof down the way it was being taken down. By this he evidently

meant that it was perfectly reasonable and proper to take it down in sections. When asked the question: "I ask you if it would not have been a little more reasonable, considering the roof which you described as dangerous and flimsy, if Imbach's men had told not only the Miller men to get out from under the roof but their own men also?" He answered: "Yes sir, as an afterthought I would say yes but *under ordinary conditions* I would not have done so." When asked, if he had this job to do with this flimsy roof tomorrow, whether he would take the roof down the way they were taking it down with all those men under it, he answered: "Not tomorrow."

As a result of a suit for negligence filed by Frank Tate against the appellant, a verdict was returned in favor of the plaintiff, appellee. After a remittitur was filed by the plaintiff in lieu of a new trial to be granted by the court, judgment was entered in favor of the plaintiff. From that judgment the appellant appeals. It claims that its motion for a directed verdict and for a judgment *n.o. v.* should have been granted.

This Court has many times declared that a case should not be withdrawn from the consideration of the jury if there is any evidence from which a rational conclusion may be drawn as opposed to the motion to take the case from the jury. The weight and value of such evidence is for the consideration of the jury. The court must assume the truth of all the evidence before the jury tending to sustain the claim of the plaintiff and of all inferences of fact fairly deducible therefrom. *Mayor & City Council v. Bassett,* 132 Md. 427, 429; *State v. Carroll-Howard Supply Co.,* 183 Md. 293, 300; *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 532. We will therefore look at the evidence in this case in a light most favorable to the appellee, plaintiff below.

The appellant contends that the trial judge erred in refusing to instruct the jury that appellant would not be negligent if it performed the work in a manner consistent with that which a reasonable and prudent wrecker

would have employed under the same circumstances. We are of opinion that the trial judge was correct in this refusal. There is no evidence here that a reasonable and prudent wrecker would have performed the work as appellant did. It is true that these experts said that they would have taken the roof down in sections. However, it is equally plain that Mr. Hagel was of opinion that the derrick hitting the pier knocked down the posts next to the barge which caused the shed to fall. Mr. Collison did not believe that the collapse of the third column was the cause of the whole roof falling. The weight of the so-called expert testimony was for the jury. *Paul Construction Co. v. Powell,* 200 Md. 168, 180-181, 88 A. 2d 837, 843. There was no evidence in this case to show that a reasonable and prudent man, holding himself out as possessing the superior knowledge of a wrecker, would hook a cable from a post on a pier to a barge, which was not tight against the pier and, without fenders, allow power to be put on, which would snatch the cable and pull the barge against the pier and knock down the decrepit shed. The appellant in this Court admitted that the shed came down from a pull or "bump".

The appellant strenuously argues that the collapse of the shed was not sufficiently foreseeable to a reasonably prudent man in the position of the appellant. It is true, of course, that negligence may be gauged by the ability to anticipate danger. If the defendant in this particular work could not reasonably have foreseen any injury as a result of his act at the time he performed it, there was no negligence and no liability. As stated by Chief Judge Sobeloff in *Stottlemyer v. Groh,* 201 Md. 414, 424, 94 A. 2d 449, 454: "It is not negligence to observe a standard of conduct which is not shown to be unusual and which is generally not thought to call for special measures to avoid injury." In the instant case, the jury could well have found from the testimony that the pulling down of this shed was essentially a dangerous operation. Charles Collison, appellant's ex-

pert, so testified. Appellant admits in its brief that it "held itself out to the world as possessing the superior skill and knowledge of a wrecking company". Jones himself admitted that he was "scared of the building". He knew that at least six men were removing fertilizer from this shed. He must have known that the roof was all in one section. The jury could have found, as testified to by Johnson, that when the third post did not come loose when power was first applied, the throttle was then opened and a stronger pull was put on the cable which was snatched. The jury could have found that any reasonable man would know that, when the pull was put on the post, which was one of the supports for a whole roof, and it did not come out, the barge, which was not tight against the pier, would strike this pier and as a result the dilapidated shed would fall down. It was certainly a jury question as to whether the falling of the shed was reasonably foreseeable to appellant.

What constitutes due care in a case necessarily depends upon the facts of that case and ordinary care varies with the nature of the undertaking. In *State v. Baltimore Contracting Co.,* 177 Md. 1, the Baltimore Contracting Company operated for a railroad company a yard in which coal cars were emptied and shifted. It was held there that the Contracting Company was not liable for the death of one employed by the railroad company to inspect the cars and equipment, there being no eye witnesses to the accident. This Court said at page 22: "It is indubitable, both as a matter of law and of humanity, that if defendant had any reason to anticipate that persons might lawfully be employed in, on, under or about the standing cars, that it was under a duty to warn such persons of any movement of the train which might endanger them. To permit a train of heavy freight cars to smash into standing cars on which men, to its knowledge, might be working, without warning them of the movement, would not only be negligent but would constitute wanton and criminal reck-

lessness." If the appellant, defendant here, had any reason to anticipate that the shed here might fall down, knowing that persons were working in said shed, it was its duty to warn such persons of the danger. Knowing that the work was dangerous and that the shed might collapse and not warning the occupants of that danger, negligence on the part of the defendant would be established. Negligence is essentially relative and is predicated upon the existence of given facts which impose the duty of so acting in respect to such facts as not to inflict injury upon another which could be avoided by the exercise of that degree of care and prudence which persons of ordinary judgment and prudence may reasonably be expected to exercise under the same conditions.

In the instant case the jury, under the evidence presented, could have found the following: The appellant held itself out to the world as possessing the superior skill and knowledge of a wrecking company. The superintendent did not go to the pier to inspect it or determine how the work should be done. He sent Jones to superintend the work without any instructions. Jones, although experienced in pile driving, had previously demolished only one shed on a pier, thirty years before. At that time he was merely a helper. Jones knew this was a dangerous operation and was afraid of the building. Jones also knew that at least six men were working under the shed. He did not tie the barge tight against the pier or fend it off with piles which, according to Mr. Hagel, was the customary procedure. He attached the cable to the third post and, when pressure was applied, it did not come loose. Knowing the men were under the shed, that the roof was "all one roof" and not warning them of impending danger, he opened the throttle again and snatched the cable. As a result the post was pulled, the barge struck the side of the pier, the derrick hit the columns on the barge side of the pier, breaking off the columns there, and the shed fell down. We are of opinion that there was evidence

from which a rational conclusion could be drawn by the jury that the appellant was negligent in not warning Frank Tate, appellee, who was in the shed removing the fertilizer, to leave the building and that, therefore, the case should not have been withdrawn from the jury. It was said in *Charlton Bros. Co. v. Garrettson*, 188 Md. 85, 94, a tort action: "The law requires proof of probable, not merely possible, facts, including causal relations. Reasoning *post hoc, propter hoc* is a recognized logical fallacy, a *non sequitur*. But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the absence of evidence of any other equally probable cause. *Baltimore City Pass. Ry. Co. v. Kemp*, 61 Md. 74; *State of Maryland, to Use of Goralski v. General Stevedoring Co.*, D. C., 213 F. 51, 61, 62, affirmed *Joseph R. Foard Co. v. State of Maryland*, 4 Cir., 219 F. 827, 830-832." *Paul Construction Co. v. Powell*, 200 Md. 168, 181-182, 88 A. 2d 837, 843, *supra*.

During the closing argument, one of the attorneys of the appellee made the statement to the jury: "Taylor [one of the attorneys for appellant] and every lawyer who has ever looked at this case knows it is one for a large verdict." After the jury had retired, Mr. Taylor moved the court to declare a mistrial and gave, as one of his reasons, the above quoted remark made by appellee's counsel. The trial judge informed the appellant that if it had made an objection to that remark he would have changed it, and that it could have been cleared up more easily at the time the statement was made. The trial judge further offered to call the jury back and instruct them to disregard this statement. The appellant declined this offer. We are not of opinion that the trial judge should have declared a mistrial. *Wolfe v. State*, 173 Md. 103, 119. Finding no error, the judgment will be affirmed.

*Judgment affirmed, with costs.*