GREAT A. & P. TEA CO., ETC *v.* HILL, ETC.

[No. 90, October Term, 1952.]

*Decided March 13, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William B. Kempton,* with whom was *Walter M. Jenifer* on the brief, for appellant.

*Robert E. Coughlan, Jr.,* with whom were *Lord, Whip and Coughlan* and *Michael Paul Smith,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment entered on the verdict of a jury reversing a decision of the State Industrial Accident Commission and allowing the appellee compensation.

The single question presented is whether there was legally sufficient evidence to show that the sole and proximate cause of the injury sustained by the claimant on April 29, 1951, was the result of the previous accidental injury sustained by her on January 23, 1948. No question of limitations is presented. The trial court having refused the appellant's demurrer prayer and motion for judgment n. o. v., the appeal comes here. Of course, in ruling on this demurrer prayer all evidence and all natural and legitimate inferences therefrom in favor of the appellee must be assumed as true and all conflicts in the evidence must be resolved in favor of the appellee. We will therefore recite the evidence in the light most favorable to her.

On January 23, 1948, the claimant, appellee, Mary McCarthy Hill, while in the employ of The Great Atlantic

and Pacific Tea Company, (A. & P.), appellant, slipped and fell on ice while returning to work from her lunch hour. As a result thereof she sustained a fracture of the lower portion of the tibia bone in her leg and of the lower portion of the fibula bone above her left ankle. For this accident she was awarded by the State Industrial Accident Commission temporary total disability from January 23, 1948, to July 11, 1948, and twenty dollars a week from July 12, 1948, for permanent partial disability "resulting in 33⅓ percentum loss of use of her left foot". She remained in the employ of A. & P. until August, 1949, "when they had an economy cut, and my [her] position was done away with". She then obtained employment with K. Katz & Sons of Baltimore by whom she was employed until her second injury on April 29, 1951.

At the trial of this case Mrs. Hill testified under oath that while her leg was broken the first time and she was receiving treatment, the doctor had difficulty in deciding when she could walk on it. She was required to take medicine to form callus around it. She walked on the leg when the doctor told her to do so and when she returned to work. She said: "I always had a feeling that I wasn't safe walking on it. I had to watch myself, and I felt insecure, and I always had to be extra conscious of my leg. It always pained; at times worse than others." She said her leg felt weak and she never felt secure on it. The left leg swelled and became very large and the other leg did not hurt at all. She said on Sunday, April 29, 1951, she was in the house of her mother-in-law, and about "dusk" was carrying a hat and a small box of plastic drapes out to the automobile. She went down the steps and was walking, as she had since the previous accident, across the dry grass on the level lawn. She felt a sharp pain in her left leg where it had broken before and heard "a snap" and fell. She had always limped since the previous accident. After she fell she started to cry and called her husband. Her husband, mother-in-law and sister-in-law took her

to the hospital. She talked to no one at the hospital. They had given her medicine to ease her pain and she felt "dopey". She further testified that after the accident in January, 1948, "* * * callus was difficult to form around my bones, and the doctor prescribed cod liver oil and orange juice, and calcium pills a couple of times a day, and X-rays failed to show whatever forms around the bone to make it strong was there for quite a long time. * * *" On cross examination she stated that she had never fallen down from January 23, 1948, until April 29, 1951.

Mr. Edwin C. Hill, the claimant's husband, testified that he found his wife lying on the level lawn "flush with the roadway" where his automobile was parked. The grass was dry. The information received by the hospital as to the cause of the injury was given by his mother.

Dr. H. Alvan Jones, whose qualifications as an orthopedic specialist were admitted, said he saw Mrs. Hill for the first time on April 30, 1951, at the hospital. He said the history he obtained from her, as he recalled it and had in his notes, was "that she slipped on getting out of her husband's automobile. In fact, she said her leg simply gave way as she stepped out of the car and walked on the ground adjacent to the car." He saw the X-ray films which had been taken the evening before. These films showed a comminuted fracture of the tibia, which is the larger bone in the leg, and a fracture through the lower third of the fibula bone, which is the small bone on the outer side of the leg above the ankle. By comminuted fracture he meant "that there is more than just two pieces. The fact is, there looked to be three or four pieces." He testified: "These X-ray films show some changes at the ankle. The tibia, which is the large bone that I mentioned, is sharpened at the back. The ankle joint space is definitely narrowed, more narrow than normal, and that is about all I can say as far as what the X-ray revealed." He said that Mrs. Hill told him of the accident in January, 1948, when she

slipped on ice while entering or leaving the A. & P. store where she was employed. He further said: "The injury that she sustained in 1948 was apparently one that necessitated a very long period for recovery, to the point, at least, where she was ambulatory, so that when I examined her, she related this recent injury. She said that this ankle had never been normal either as regards its range of motion or strength, and in asking about what doctors treated her, she mentioned to me that she had been seen by Dr. Lenhard, with whom I am associated, at one time following this initial injury, so that I had an opportunity to review those films taken by Dr. Lenhard, and I have those X-rays with me too because it is of interest—at least, I think it is important that the fibular fracture that she sustained * * * the evening before, the 29th of April, 1951, was a fracture through the old fracture site of this same bone. The facture of the tibia was at that same level as the fracture of the fibula this time. The fracture previously involving the tibia was right at the ankle joint or about two and a quarter inches or so below this new level. Q. Well, what do the X-rays, Doctor, taken by Dr. Lenhard show with regard to the condition of the tibia and fibula at the time they were taken as to union or anything that is significant? A. These X-rays are dated February the 13th, 1950, and they show, as I have mentioned, an old fracture of the lower third of the fibula which appears to be held, and I don't know whether I can describe it, but you can see that while it is held, there is actually a defect in this bone, because there is one piece of it in the back that is truly separated from the main fragments both above and below it, and there is a space in between so that you know that while the fractures have held, they have held with a bone, or, with the type of bone that isn't actually as substantial and firm as perhaps it was before the initial injury. You can, as I say, see all the way through that bone, indicating that there is a definite defect. The fracture of the lower end of the tibia, which apparently

involved the ankle itself, has held, but with a narrow joint space and with what we term a traumatic, post traumatic arthritis, so that the fracture of April, 1951 did involve the weakened portion at least of the fibula. * * * If an injury to a bone occurred in 1948 as the history indicates, January, 1948, in two years, if that is what the picture is in two years, I don't think any further change will occur because it is well anchored, well healed below and above; and we see bones that do that, if their fragments are separated enough they may never fill in to actually obliterate the spaces between, and I doubt if— in fact, I don't believe that after two years that this picture would change."

Also admitted in evidence was a letter from Dr. C. A. Waters to Dr. S. H. Barranco, dated October 4, 1948, which contained the following: "Comparing today's film with those taken previously on Miss Mary M. Hill's left ankle and lower leg shows a little more callus, but the fibula is still not completely united. I think it is rather doubtful whether this fracture ever will completely fill in with callus."

The following issue was submitted to the jury, which returned the answer "Yes": "Is the disability resulting from the accident occurring on April 29, 1951 the result of the accidental injury occurring on January 23, 1948, which accident arose out of and in the course of the Claimant's employment?"

In *Paul Construction Company v. Powell,* (1952), 200 Md. 168, 181-182, 88 A. 2d 837, 843, the employee had an accident on June 19, 1950. He was operated upon on July 28, 1950, and seventeen hours after the operation he died. The employer contended that death was caused by *delirium tremens,* as it was claimed that he drank to excess, and not by the operation. Judge Markell in that case, after reviewing the authorities, quoted from *Charlton Brothers Company v. Garrettson,* 188 Md. 85, 94, 51 A. 2d 642, the following: "* * * But sequence of events, plus proof of *possible* causal relation, may amount to proof of *probable* causal relation, in the

absence of evidence of any other equally probable cause." He said: "To prove that death could not have resulted from the operation, it was necessary to show at least that it could have resulted from some other cause. The jury could not find that death did not occur and could not be expected to find that it resulted from a miracle. * * * The workmen's compensation cases in which, in words or in effect, 'proximate cause' was given a broad definition seem to indicate that when, without medical testimony, there is shown a direct sequence from an accident to the alleged consequences, * * * causal relation may be inferred from such sequence in the absence of affirmative evidence of an independent intervening cause. In the instant case it may be that, without any medical evidence at all, the fact that death followed the operation within seventeen hours would have been sufficient to justify an inference of causal relation between the accident and death."

Here, there is no doubt that Mrs. Hill had the fractures on January 23, 1948, and was disabled for a long period of time. She said, and for the purposes of the demurrer prayer her testimony must be considered as true, that ever since that accident her leg had been weak and insecure. She said nothing occurred to the leg until April 29, 1951, when the leg "snapped" while she was walking on level ground, the fibula bone being fractured at the same place as on January 23, 1948, and the tibia bone having a comminuted fracture. She said there was no intervening cause. "It would seem to be established in this state, in workmen's compensation cases, that 'proximate cause' means that the result could have been caused by the accident and that there has not intervened, between the accident and the result, any other efficient cause." *Baber v. John C. Knipp & Sons,* 164 Md. 55, 67, 163 A. 862, 867; *Unger & Mahon v. Lidston,* 177 Md. 265, 9 A. 2d 604. Furthermore there is here competent medical testimony that the former fracture of the fibula had never sufficiently knitted. The trial judge should not have ruled as a matter of law that the evidence was

not of sufficient probative force to enable a mind of average intelligence to conclude that the injury of April 29, 1951, was the result of the accidental injury previously sustained by the appellee on January 23, 1948. Of course, the verdict reached by the jury on the evidence is not for us to review. The judgment will be affirmed.

*Judgment affirmed, with costs.*