ALESHIRE ET AL. *v.* STATE, USE OF
DEARSTONE ET AL.

[No. 265, September Term, 1960.]

358

*Decided May 16, 1961.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*James F. Couch, Jr.,* with whom were *Couch & Blackwell* on the brief, for the appellants.

*Jerrold V. Powers,* with whom were *Sasscer, Clagett & Powers* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

The appellants, the defendants below, appeal from judgments in favor of the plaintiffs below. The appellants were the owner, Tester, and driver, Aleshire, of a truck hauling sand and gravel from the Contee Sand and Gravel Company. Plaintiffs' decedent was killed when sucked into a sand hopper, upon which he was walking, and from which Aleshire was attempting to obtain a load of sand.

In order to determine the questions raised, it will be necessary to set forth the facts in some detail. Contee operates a production, processing, and distribution of sand and gravel material business, primarily from a site near Beltsville, Maryland. It also is the owner of a subsidiary corporation, Prince George's Sand and Gravel Company, generally located in the same area. Contee's physical setup includes a wash plant, consisting of several bins or material containers, mounted on concrete piers, into which sorted material (sand and gravel)

is dumped, and from which trucks are loaded. The trucks drive underneath the bins by using driveways between the concrete piers. The Company also has an area in which sand and gravel material is stock piled, and from which materials may be received by truckers for delivery.

The "plant" is located in one area; the "stockpile" in another. The terms must be distinguished in considering the evidence.

Contee maintained a dispatcher, who instructed the drivers what to load and where to deliver the same. Appellant Tester was the owner of a sand and gravel hauling truck, operated by his employee, Aleshire. Aleshire generally hauled out of the Prince George's Sand and Gravel Company, but on the day of the accident, he had been ordered to report to the dispatcher of Contee for hauling from Contee. Appellees' decedent was an employee of Contee, working as a member of a repair and maintenance crew, under the direction of a Mr. Frazier, who was the foreman thereof. The normal working hours for the wash plant were from 7:00 a.m., to 5:00 p.m. Monday through Friday, and from 7:00 .a.m., to 12:00 noon on Saturdays. Generally, the material hauled out of Contee's plant was hauled by independent truck owners (although Contee also owned and operated its own trucks), and operated by their employees. After driving underneath a particular bin at the plant, the driver would stop and call instructions for his load to the company loader, who would, thereupon, load the truck by manipulating levers located at the bottom or mouth of the bins, in a room on the floor above the body of the truck. This room was reached by ascending outside steps. The levers were of simple construction, consisting merely of metal rods that opened the mouths of the chutes to permit sand or gravel to drop into the trucks.

Frazier, the foreman of the work crew, testified that certain repair work was to be done on a Saturday afternoon, the day of the accident. This work was to remove and replace a twelve inch vertical pipe that ran down from the sand classifier which was about 30 feet in diameter. This involved hooking the pipe onto a crane, taking a torch and cutting off the pipe from a tank, and replacing the same with

a new pipe, which was to be welded onto the tank. Saturday had been selected, because the normal operations of Contee generally closed at noon on that day.

The crane had been ordered, specifically, to assist in making the repairs, and it was in position (except the boom had to be swung around in place), with its operator. The sand bin was below the sand classifier, and, as Frazier needed a good level platform to work from at the level of the top of the sand bin, he had made arrangements to have the bin left loaded, so he and his crew could work from the top of the sand.

After the plant had been shut down for some twenty minutes, he took his two main men, the riggers, to the top of the bin, walked across the sand, and showed them where he wanted "to hook on with the crane," and directed them "to get their torches up there and get things ready to start cutting the pipe." At that time, there were no trucks "in sight as far as [he] could see." He called to Dearstone, who was still on the ground, and directed him to bring up a guy chain. Then he went down the steps (passing Dearstone as he went up with the chain) in order to check the crane and give its operator instructions. He had only been off the ground for about five minutes. When he reached the ground, he saw a truck in the driveway under the bin in which the men were working; and, at the same time, someone "hollered" that Dearstone had gone down in the sand bin. Aleshire, who was unknown to him at the time, was standing on the ground, either beside his truck or half-way between the truck and the steps. He rushed up the steps to be of assistance to Dearstone, but he and the crew were unable to save him.

Mitter, one of the riggers, testified that he was on the sand at the top of the sand bin; that he and the others had walked across the sand without difficulty; that he could not see any trucks from where he was; and that Dearstone was walking across the bin to give the chain to the other rigger, when the "center dropped down," and Dearstone was covered up.

Aleshire was then called as a witness by the plaintiff. He stated that he had hauled several previous loads from Contee

on the fatal Saturday and when he returned, shortly after noon, the plant was not in operation. He reported to Contee's dispatcher, one Duvall, who told him to "go get a load of sand." He proceeded to the plant and saw Frazier standing there, but he did not make any inquiry of Frazier. He went up the steps to the lever room, where he had been before, and pulled one of the three levers ("all of which empty into the same thing") ; whereupon sand came out of the chute and finally Dearstone's leg.

Duvall, the dispatcher, testified that the truck drivers reported to him, and he instructed them what to load and where to deliver the loads. On the Saturday in question, the plant had ceased normal operations at noon, but the State desired deliveries of sand during the afternoon on the "Princemont" project. Consequently, Contee had arranged to have a crane and front-end loader at the stockpile, with its (Contee's) operators to load the trucks that afternoon. There was no Contee loader at the plant that afternoon. The sand supplied to this particular State job was supposed to come from the stockpile, as the sand had been permitted to dry before being placed there, while the sand at the plant was too wet to meet specifications. He knew that some repairs were going to be made at the plant that afternoon, but the nature of the repairs was unknown to him.

He further stated that, "nobody loads theirself out at that plant, * * * it has always been that way," but he admitted that he had never told "any one particular person that they [were] not to load theirself," nor had Contee ever posted or disseminated a rule, or regulation, to that effect.

On Saturday, Aleshire had hauled one or more "private" loads, and then was assigned to haul to the Princemont job. Duvall instructed him (just prior to the Dearstone accident) "to get a load of sand for the State." When Aleshire left the office, Duvall could not see where he went, but he was supposed to have loaded from the stockpile, because of the State's specifications. Duvall flatly denied that he told Aleshire to go to the *plant* and get a load of sand.

He stated on cross-examination, however, that it was pos-

sible he "told [Aleshire] to load a load of sand and didn't exactly specify to load out of the plant or the [stockpile]"; that he did not inform Aleshire that repairs at the plant were to be made that afternoon; and that, when Aleshire came to his office after the tragedy, he did not remonstrate with him for being at the plant, nor did he say to Aleshire that he had broken any company rule.

Three truck drivers were then called by the plaintiffs, and testified that they could get a load of sand out of the plant early in the morning, but after "the drain out in the morning" they had to get it from the stockpile. Two of them admitted that they had, on occasions, loaded their own trucks.

Aleshire then took the stand as a witness for the defendants. He stated that he had hauled one load to Princemont (he thought) on Saturday. This load he had obtained from the hopper (a part of the plant), and it had been accepted on the job. When he returned, he was told by Duvall to "get another load of sand out of the hopper." He drove his truck to the hopper and stopped underneath it. Frazier was standing there, and, although he saw Frazier and Frazier saw him, neither spoke. He walked up the steps, proceeded to the room, and pulled "his levers"; and the accident happened. After the accident, he returned to the office and asked Duvall why he had sent him up there, "to pull them gates on that boy?" To which Duvall replied, "* * * I didn't know that man was in the hopper. I knew they were out there somewhere, but whereabouts I did not know."

He further stated that he had loaded for himself before, he had seen others do it, and he had never been told by anyone about any company rule or policy that drivers were not supposed to load for themselves.

Alonzo Myers, another truck driver, testified that he had been hauling to the Princemont project that Saturday morning, and he had obtained his loads from the plant. The sand was damp, but it wasn't wet. One, or more, of his loads, he had loaded himself.

Richard Myers, Jr., also a truck driver, had loaded for himself at the plant on any number of occasions, had seen

other drivers do likewise, and he knew of no company rule or policy that prohibited the same. He was in the office and overheard Duvall specifically instruct Aleshire (just prior to the accident) to, "go back to the new plant and get a load of concrete sand."

Appellees are the widow and children of the decedent and the Maryland Casualty Company, Contee Sand and Gravel Company's compensation insurance company, which had been paying appellees under a compensation award, arising out of the death of the appellees' decedent.

Upon the above facts, the appellants allege three assignments of error: (1) that the trial court should have submitted the question of the appellees' decedent's contributory negligence to the jury; (2) that the court should have granted their motion for a directed verdict; and (3) that the court erred in refusing to instruct the jury in regard to foreseeability being a necessary element of negligence.

## I

This assignment of error needs no extended discussion. A careful examination of the evidence in a light most favorable to the appellants discloses no action or conduct on the part of the appellees' decedent upon which negligence on his part could be predicated; hence, the court's ruling that he was free of contributory negligence as a matter of law was correct.

## II and III

These contentions may be considered together. However, before considering them on their merits, we shall dispose of a technical subsidiary question raised by the appellees. At the close of the plaintiffs' case below, the appellants made a motion for a directed verdict, which was denied. Then, at the close of the taking of all of the evidence, the appellants' counsel stated to the court that he, "would like to renew [his] motion made at the conclusion of the plaintiffs' case, and [he] would * * * like to let [his] Honor know why * * *." The appellees argued that since this was "a renewal" of the original motion, which said original motion was withdrawn by the offering of testimony by the appellants, Maryland Rule

552 b, the question of the correctness of the court's ruling in denying the second motion is not properly before this Court. They also claim that the appellants failed to state the grounds for the motion, and, therefore, did not comply with the provisions of Rule 552. We are unable to agree with either contention. His second motion was not, in reality, intended to be a "renewal" of his original motion, and it was not so treated by either the trial court or counsel. The record discloses that the original motion stated as its grounds that the plaintiffs had failed to prove that the defendants were guilty of primary negligence proximately causing the death of the plaintiffs' decedent; and in support of the second motion, appellants' counsel amplified these grounds by expressly stating to the court his contention of a lack of a reasonably foreseeable duty on the part of the defendants in the plaintiffs' case. We think the motion is properly before us, and proceed to its consideration.

In support of their motion for a directed verdict, the appellants claim that the appellees failed to show a legal duty owed by the appellants to the appellees' decedent, or any negligence on their part proximately causing his death. They contend that Aleshire's act of self-loading was not such an act as to show that he had actual knowledge, or to charge him reasonably with knowledge, that the act involved danger to another. They accurately point out that in order to make out a proper case of actionable negligence, it is incumbent upon the plaintiff to establish a duty owed the plaintiff by the defendant, a breach of that duty, and resulting injury to the plaintiff proximately caused thereby. This normal concept of actionable negligence, which is "relative to the need and occasion,"[1] anticipates knowledge on the part of an actor of the danger which later results in injury. This knowledge, in turn, may be either actual, or what in law amounts to the same thing—an opportunity by the exercise of reasonable care, prudence and diligence to acquire knowledge. As it is succinctly stated in 38 Am. Jur., *Negligence,* paragraph 23:

1. Babington v. Yellow Taxi Corporation, 164 N. E. 726, 727 (N. Y.), Opinion by Cardozo, C. J.

"* * * Negligence presupposes a duty of taking care, and this in turn presupposes knowledge or its equivalent."

This knowledge, actual or implied, is the foundation of actionable negligence, which is a relative term generally, and it is clearly relative in reference to the knowledge of the risk of injury to be anticipated. The notion of foreseeability has been correlated with the development of liability for negligence for many years; and injuries which could by no reasonable possibility have been foreseen, and which no reasonably prudent person would have apprehended, cannot form the basis for actionable negligence.

In *Texas Company v. Pecora,* 208 Md. 281, 295, 118 A. 2d 377, this Court said:

> "Knowledge of the danger involved is a necessary element of negligence. [citations]. Unless a defendant has actual knowledge or is reasonably chargeable with knowledge that his act or omission may injure another, he is not guilty of negligence. All of the circumstances under which he acts or omits to act must be considered and measured by the standard of the [mythical] reasonably prudent man. The general rule is that the question of negligence must be left to the jury."

Again, in *Sanders v. Williams,* 209 Md. 149, 152, 120 A. 2d 397, the Court, speaking through Judge Hammond, stated:

> "As is true of primary negligence, one measure of contributory negligence is the need, in a given situation, to anticipate danger. Presence or absence of reasonable foresight is an essential part of the concept. One is charged with notice of what a reasonably and ordinarily prudent person would have foreseen and so must foresee what common experience tells may, in all likelihood, occur, and to anticipate and guard against what usually happens. On the other hand, one is not bound to anticipate every possible injury that may occur or every possible eventuality."

The Court then went on to uphold the trial court in its ruling that a plaintiff had been free of contributory negligence, as a matter of law, because he was not bound to have anticipated, nor reasonably to have foreseen, certain actions on the part of one of the defendants.

And, again, in *Katzel v. Clark,* 215 Md. 54, 62, 137 A. 2d 125, Chief Judge Brune, for the Court, quoted from the early case of *State v. Washington, etc.,* 130 Md. 603, 612-613, 101 A. 546, in this manner:

> " 'It is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.' "

In *Martin G. Imbach, Inc. v. Tate,* 203 Md. 348, 357, 100 A. 2d 808, the Court said, "If the defendant in this particular work could not reasonably have foreseen any injury as a result of his act at the time he performed it, there was no negligence and no liability." See also, *W. B. Bradley v. N. H. Yates,* 218 Md. 263, 270, 146 A. 2d 433; *Adams v. Carey,* 172 Md. 173, 186, 190 A. 815; 38 Am. Jur. *Negligence,* §§ 23, 24; 2 Harper & James, *The Law of Torts,* § 20.5; Prosser, *The Law of Torts* (2nd Ed.), § 30.

Of course, the test of foreseeability, or reasonable anticipation as it is sometimes called, must be judged by foresight, not in retrospect. The wrongfulness, *vel non,* of a person's conduct must be evaluated in the light of the risks apparent to him at the time, and not by looking backward "with the wisdom born of the event." Cardozo, C. J., in *Greene v. Sibley, Lindsay & Curr Co.,* 177 N. E. 416 (N. Y.). See also, *Martin G. Imbach, Inc. v. Tate, supra.*

This brings us to the heart of the case. After a careful review and analysis of the evidence, we reach the conclusion that the trial judge was correct in denying the appellants' motion for a directed verdict. When the evidence is considered in a light most favorable to the appellees and all of the

favorable, rational inferences to be drawn therefrom, we are unable to say, as a matter of law, that Aleshire, under all the surrounding circumstances, could not have reasonably foreseen danger to the men upon the sand bin. When reviewed most favorably to the appellees, there was evidence (we, of course, do not suggest nor express any opinion concerning its accuracy or the weight to be given it) to the effect that the "plant" had ceased operating on Saturday afternoon; that when Aleshire was told by Duvall to get another load of sand, he was supposed to get it from the stockpile; that when he pulled underneath the sand chute, there was a large crane, with its operator, in close proximity to the hopper; that three men were on top of the sand, which was level with the top of the sand bin, and the foreman was close by; and that there were torches, chains and other equipment ready to make the repairs. The pictures offered as exhibits show that if the sand bin were filled to the level of its top, men walking on the sand were easily discernible from most locations nearby. The law of negligence, insofar as perception is concerned, requires a person to give to his surroundings the attention that a reasonably prudent person would consider necessary under the circumstances, and he must use his senses to discover what is readily apparent. 38 Am. Jur., *Negligence,* § 24; Prosser, *op. cit.,* § 31, p. 129. And there was further evidence, although slight, to the effect that truck drivers were not supposed to load their own trucks. Taking into consideration all of the circumstances, as the evidence discloses them to be most favorable to the appellees, and the rational inferences that may be drawn therefrom, we hold that the trial judge was correct in submitting the question of Aleshire's primary negligence to the jury for determination. For an extensive collection of the cases wherein it was held that "reasonable anticipation" was a question for the jury, see 1 Shearman and Redfield, *Negligence* (Rev. Ed.), § 24, n. 52.

Lastly, the appellants claim error in the court's instructions to the jury. At the close of the testimony, they offered two written prayers that related to the rule of foreseeability; both were rejected. The court proceeded to instruct the jury orally. After explaining that the burden was upon the plain-

tiffs to prove that the defendants were guilty of negligence, he informed the jury it was important that they understand the legal definition of negligence, and continued by saying:

> "Negligence may be defined as the doing of some act or acts—whether it is one or several—that reasonably prudent people would not do under like circumstances, or, the failure to do some act or acts that reasonably prudent people would do under like circumstances. So that as I have said often before, your beacon light or guide post is: How do reasonably prudent people conduct themselves under like circumstances. And if you find that in this case the defendants did not conduct themselves as reasonably prudent people would have conducted themselves under like circumstances and that that conduct which was contrary to the action of reasonably prudent people constituted a contributing cause to the death of Mr. Dearstone, then the defendants are guilty of negligence if they are guilty of such conduct.

* * *

> "Now, that is simply the issue that you have to decide. Maybe the answer isn't so simple, but the issue is simple. Did the defendants conduct themselves in such a manner that reasonably prudent people would not have conducted themselves resulting in the death of the decedent. If you are satisfied by a preponderance of evidence that the defendants did, then your verdict should be for the plaintiffs, and if you are not so satisfied by a preponderance of the evidence your verdict should be for the defendants."

At the conclusion of the court's charge, the appellants' counsel stated to the court: "I again request the court that he go further in the explanation of what is negligence to point out that foreseeability, constructive or actual knowledge on the part of the defendant are necessary requirements before negligence can be found."

It is not necessary that we pass upon the written prayers offered. Maryland Rule 554 provides several possible methods for the trial courts to instruct juries. Requested written instructions, even though they be correct expositions of the law, need not be granted, provided "the matter is 'fairly covered by instructions actually given; * * *." Maryland Rule 554 b 1. In the instant case, the appellants not only offered written prayers on the question of reasonable anticipation, but specifically objected to its omission from the court's charge (Rule 554 d).

We went to some length above in pointing out the importance of the rule of foreseeability in the law of negligence. The appellants find no fault with the quoted portion of the court's charge as an abstract statement of the law, but earnestly contend that it did not "fairly" cover the question of reasonable foreseeability. We agree. The court's instructions set forth the meaning of negligence in just about as general terms as the word may be defined. Reasonable anticipation, or reasonable foreseeability, is an essential and vital element in liability for negligence. The court's charge, as given, gave the jury no intimation of this necessary ingredient of the alleged liability of the defendants. The defendants' only substantial defense (provided the jury agreed with them) hinged upon this question alone. We think the appellants were entitled to have the jury fairly instructed upon their theory of the case, *State v. Barlly,* 216 Md. 94, 140 A. 2d 173, and compare *Ager v. Baltimore Transit Company,* 213 Md. 414, 132 A. 2d 469; and we hold that the language used by the court in defining negligence was couched in such general terms that it failed to cover "fairly" the matter of reasonable foreseeability.

Upon remand, it will be unnecessary to retry the question of the *quantum* of damages, but only the single issue of the defendants' negligence. Maryland Rule 872 a; *Eastern Contractors Inc. v. State,* 225 Md. 112, 169 A. 2d 430.

*Judgments reversed in part, and case remanded for a new trial. The costs to abide the result.*