RAGONESE, INFANT, Etc. et al. *v.* HILFERTY AND SMITH, et al., Etc.

[No. 253, September Term, 1962.]

*Decided June 5, 1963.*

522

The cause was argued before Brune, C. J., and Hender-son, Prescott, Horney and Sybert, JJ.

*Nathan Patz* for appellants.

*Robert E. Coughlan, Jr.,* with whom were *Alva P. Weaver, III* and *Lord, Whip, Coughlan & Green* on the brief, for appellees.

Sybert, J., delivered the opinion of the Court.

This is an appeal from a judgment for costs entered by the Superior Court of Baltimore City on a jury verdict in favor of the appellees (defendants below), Edward F. Hilferty and a partnership doing business as Smith's Bus Company, in a suit brought by the infant appellant, Edward Ragonese, and his parents for injuries and consequential damages sustained as a result of his being struck by an automobile after his discharge from a school bus driven by Hilferty and owned by the bus company.

The Ragonese boy, eight years of age at the time of the accident, had been transported daily, with other fare paying school children, between his home and his school (both in Baltimore City) by the bus, pursuant to an oral contract between his parents and the bus company. The bus would pick up the boy in front of his home at 102 East Belvedere Avenue, on the north side of the street, in the morning and would discharge him on the south side of Belvedere Avenue, opposite his home, in the afternoon. The evidence shows that Mrs. Ragonese knew this and that it was because the bus company had an established route which it would not change.

The testimony of the appellee, Hilferty, indicated that he had had approximately 20 years' experience as a school bus driver prior to the accident, which occurred on March 2, 1956. On that afternoon the bus, carrying approximately 40 home-ward bound students, proceeded from the school in an easterly direction along Belvedere Avenue and stopped next to the south curb at a Baltimore Transit Company bus stop, which was marked by a sign reading "Bus Stop". This point is di-

rectly across Belvedere Avenue from the Ragonese residence. Belvedere Avenue, at that point, is 36 feet in width and accommodates two lanes of moving traffic in each direction. The street runs generally in an east-west direction but, immediately to the east of the Ragonese home, it curves slightly toward the north and also rises gradually to the crest of a hill which is approximately 510 feet from, and 17 feet higher than, the Ragonese entrance walkway. A police officer and the injured boy's father testified that there had been no change in the street since the accident. A photograph, taken in 1962 and introduced by the plaintiffs, shows a double white line in the center of the street.

The day of the accident was clear and dry. When the bus stopped, its front end was approximately 50 feet west of Croydon Road, a public street dead-ending into Belvedere Avenue from the south. The bus was painted yellow and was equipped front and rear with double red flashing lights which were operating. The testimony was that the bus remained stopped with its doors closed for about two minutes waiting for traffic in both directions to stop. All traffic in sight did stop. At least one car stopped about 15 feet to the rear of the school bus headed easterly in the "fast" lane, thus effectively blocking east-bound traffic. A line of at least three west-bound cars stopped, the first one being from 20 to 25 feet in front of the bus. These automobiles were about in the middle of the two west-bound lanes but closer to the center of the street than to the north curb, thus apparently blocking west-bound traffic.

The eldest student on the school bus was twelve year old Susan Pollard, who was in the seventh grade and was a member of the school safety patrol. Susan escorted Edward Ragonese off the bus, crossed in front of it, and stood at its front left corner and looked in both directions, holding the boy's hand. She said there was no moving traffic on Belvedere Avenue in either direction, so she stepped out from the bus and told the boy to cross the street. The boy began to run, diagonally, in a northwesterly direction, toward the north curb. Apparently at, or very near to, the moment the boy began to run, an automobile owned and operated by one Chester Giddings

in a westerly direction passed the three stopped automobiles at a rapid rate of speed, characterized as in excess of the 30-mile speed limit, with its left wheels across the center line of Belvedere Avenue, and then cut back into the west-bound lane, striking Edward several feet from the north curb, and injuring him seriously.

Susan Pollard testified that no one asked her to accompany the Ragonese boy out of the bus, and that neither Hilferty nor any other representative of the bus company had ever given her instructions on what to do. She said her action was part of the safety program at the school, and that her duties consisted of "[m]ainly keeping order on the bus and making sure the children were seated, and if necessary taking them across the street or watching them across the street." She had accompanied the Ragonese boy on prior occasions.

The suit named Giddings, the driver of the car which struck the boy, as a defendant along with the appellees. Giddings died some time after the accident, and the suit proceeded against the appellees only.

Three witnesses testified as to the happening of the accident. Hilferty, who had not left the driver's seat of the bus, testified that he did not see the Giddings vehicle until it was right on Edward, but that he did hear the screeching of brakes immediately before. He said that just prior to that his attention might have been distracted by the children behind him in the bus. Susan Pollard said she did not see the Giddings vehicle until a moment before it struck the boy. Edward L. Barrett, a passenger in the front seat of the automobile stopped in the fast lane of traffic to the rear of the bus, who had an unobstructed view, first observed the Giddings automobile as it came, straddling the center line, at a very rapid rate of speed around the stopped cars, shortly after Susan had released the boy. Barrett estimated that this was about two or three seconds before the child was struck. The operator of the car in which Barrett was a passenger could not be located, and the infant plaintiff did not testify.

The point of impact as established by the investigating police officer was 69 feet west of Croydon Road and 9 feet south of the north curb of Belvedere. The officer testified that the

impact was opposite the middle or toward the rear of the bus. Barrett placed the point of impact as somewhat to the rear of the front of the bus, while Hilferty testified that the point of impact was to the rear of his driver's seat at the front of the bus. The Giddings vehicle left skid marks but their length was not established by the evidence. There was testimony that the running boy had almost cleared the oncoming car, but that its right front fender struck him.

No evidence was produced to show that the oral contract between the Ragoneses and the bus company required the bus driver to leave the bus and escort the boy across the street. Hilferty testified that there was an unwritten rule of the bus company that a driver was not supposed to leave his seat. He said that prior to the accident Mrs. Ragonese had spoken to him several times about it, and that he always replied, "I would do the best I could." He stated that on "most occasions" he would take the boy to the left front of the bus and let him go across when traffic was clear. On other occasions a school safety patrol member who was on the bus would escort the boy part way across the street. Mrs. Ragonese testified that Hilferty told her "that he never lets a child my boy's age off the bus unless he supervises the crossing and that I need not worry."

At the conclusion of all the evidence, appellees moved for a directed verdict and the court reserved ruling thereon. Appellees further submitted three instructions which were in substance requests for a directed verdict and rulings thereon were also reserved. After charge and argument, the case was submitted to the jury, which returned a verdict in favor of the appellees.

On this appeal the appellants make five contentions, all relating to the fairness and adequacy of the court's charge to the jury. Although the appellees answer each of these contentions, they maintain that the propriety, *vel non,* of the instructions is not the determinative issue on this appeal, their position being that the trial court erred in submitting the case to the jury at all. If the appellees' stand is correct any consideration of the instructions would be precluded, so we shall proceed immediately to this phase of the case. In passing upon the defendants' motion for a directed verdict we must, of course,

view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiffs' case. The issues raised by the motion are: (1) whether there was any evidence of primary negligence by the operator of the bus; and (2) whether, if such negligence be found, it was a proximate cause of the accident.

Compensated carriers have been held to owe the highest degree of care to their passengers. *Dilley v. Transit Co.,* 183 Md. 557, 561, 39 A. 2d 469 (1944). However, they are not insurers of the safety of their passengers but are only required to exercise the highest degree of care consistent with the nature of their undertaking. *Retkowsky v. Balto. Transit Co.,* 222 Md. 433, 440, 160 A. 2d 791 (1960); *Ager v. Baltimore Transit Co.,* 213 Md. 414, 426, 132 A. 2d 469 (1957). Thus, the issue of the bus driver's negligence, *vel non,* in this case turns on the question of whether the required degree of care compelled him to anticipate that another driver might violate a rule of the road, or whether the standard was satisfied by his relying on the assumption that such laws will be obeyed. See *Zeamer v. Reeves,* 225 Md. 526, 171 A. 2d 488 (1961); *Harper v. Higgs,* 225 Md. 24, 31, 169 A. 2d 661 (1961); *Nardone v. Underwood,* 219 Md. 326, 331, 149 A. 2d 13 (1959).

In the case of *Chackness v. Board of Education,* 209 Md. 88, 120 A. 2d 392 (1956), we had occasion to consider this problem in a fact situation very similar to the one before us. In that case a 12 year old boy alighted from a Harford County school bus, painted yellow and with flasher lights operating, which had stopped on the right side of a four lane undivided highway. He was accompanied to the left front fender of the bus by a 14 year old member of the school's safety patrol and, as he started to cross the road, he was struck by an automobile which came from the rear of the bus and which the safety patrolman did not see until almost the moment of impact. In that case, as in the instant case, there was no evidence that the safety patrolman was the agent or servant of the bus owner or driver. We considered the reasoning of the boulevard stop cases to be controlling, and, in holding the bus driver and owner not liable, Judge Hammond, for the Court, said (at p. 96 of 209 Md.):

"A favored driver on a boulevard is not excused from exercising the degree of care required in his environment and neither is a school bus driver. Here we think Choate met this obligation. He pulled the bus to the right side of the road, caused the warning lights to blink, and in the absence of actual knowledge, or requirement to have known, that the statute was to be violated, was entitled to rely on its protection. We find nothing to show that Choate was not justified in allowing the children to descend from the bus to a safe place at the road's edge, as he did, since he knew they were to be shepherded across the road by the safety patrolman, one of whose functions this was. We find that nothing Choate did or failed to do contributed in any way to the accident and that, as between appellant [the motorist whose car struck the boy] and Choate, the former's negligence was the sole proximate cause of the accident."

See also *Stuckwish v. Hagan Corp.,* 175 Atl. 381 (Pa. 1934); *Gholston v. Richards,* 169 S. W. 2d 846 (Tenn. 1943).

In *Chackness,* the statute violated was Code (1951), Art. 66½, Sec. 224 (now Sec. 259), which requires approaching motorists to come to a full stop for a standing school bus. While that provision applies in the counties but has no application to Baltimore City, it appears that Giddings, in cutting around the three standing cars at high speed and veering back, between the first car in line and the school bus, into the west-bound lane, violated several other provisions of Art. 66½ — the motor vehicle law. These include: (1) Sec. 221(a), which forbids driving a vehicle to the left of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless there is a sufficient clear distance ahead to permit such a passing without interfering with the safe operation of approaching vehicles; (2) Sec. 221(b)(2), which forbids driving a vehicle on the left side of the roadway at any time when approaching within 100 feet of or traversing any intersection—even though Croydon Road dead-ends at Belvedere, the junction of the two streets constitutes an intersection, as

defined in Code (1957), Art. 66½, Sec. 2(a)(20) (*Palmer Ford, Inc. v. Rom,* 216 Md. 165, 170, 139 A. 2d 697 (1958)); (3) Sec. 221(b)(3), which restricts a driver to the right side of the roadway where a distinctive centerline (such as the double white line in Belvedere Avenue) so directs; and (4) Sec. 211(a), (b) and (c), which prohibit the driving of a vehicle on a highway at a greater speed than is reasonable and prudent under the conditions then existing, and in excess of stated speeds for the type of roadway and area (the posted speed of the area in question being 30 miles per hour).

We think the reasoning of *Chackness* is applicable to the facts of the instant case, as to which there is little real dispute. Applying that reasoning, we don't think the bus company and its driver can be held liable unless, in permitting the child to cross the street under the circumstances then existing, the driver can be found to have been under a duty to anticipate or foresee that some motorist, such as Giddings, would violate the provisions of the motor vehicle laws and injure the child.

In the recent case of *Aleshire v. State,* 225 Md. 355, 170 A. 2d 758 (1961), Judge Prescott for the Court reviewed exhaustively the importance of the rule of foreseeability in the law of negligence, and concluded (at p. 366 of 225 Md.), that "* * * injuries which could by no reasonable possibility have been foreseen, and which no reasonably prudent person would have apprehended, cannot form the basis for actionable negligence." He also pointed out (at p. 367) that "* * * the test of foreseeability, or reasonable anticipation as it is sometimes called, must be judged by foresight, not in retrospect."

We find nothing in this record to indicate that Hilferty did anything which, at the time, could reasonably have been foreseen as likely to place the child in danger and thus facilitate the occurrence of the accident or that he was remiss and failed to do something which could have, in reasonable anticipation, prevented the occurrence. It is undisputed that all visible traffic was at a standstill when the door of the bus was opened; it appears from the testimony that all lanes in both directions were apparently blocked, and that Giddings' car did not appear on the scene until the boy had started to run across the street. We have found no Maryland case that requires it, but if we

assume, without deciding, that Hilferty had a duty, under the circumstances, to supervise the boy's crossing of the street, we think it was fulfilled by permitting the child to leave the bus in the company of a responsible student, a member of the safety patrol whose specific function was to shepherd younger children across the street. The use of such patrolmen is generally regarded as a reasonable and adequate provision for the safety of school bus riders. Neither the patrol officer nor Hilferty could reasonably foresee that Giddings would ignore the standing cars and the typical color and flashing lights of the school bus and run the child down.

We find that the cases cited by the appellants in support of the contention that the bus driver was guilty of negligence which was a proximate cause of the accident are distinguishable on the facts. On the authorities hereinbefore cited, we hold that there was a failure of proof of primary negligence on the part of the defendants-appellees, and that therefore their motion for a directed verdict should have been granted. We therefore do not reach the appellants' contentions concerning the fairness and adequacy of the court's charge to the jury. However, the fact that we do not pass on the instructions does not mean that we approve the instructions as given.

It will be noted that we have considered the appellees' contention that the trial court erred in not granting their motion for a directed verdict, despite the fact that the appellees did not file a cross-appeal. We have applied here the rule that to warrant a remand there must be a concurrence of error (such as that claimed in the instructions), as well as injury to the appellant. Since under the facts of the present case the appellants could not prevail in a retrial, they can claim no injury by an affirmance of the judgment. The rule has been stated or applied in the following cases, among others: *Nocar v. Greenberg,* 210 Md. 506, 124 A. 2d 757 (1956) ; *Maryland Casualty Co. v. Wolff,* 180 Md. 513, 25 A. 2d 665 (1942) ; *State v. Electric Co.,* 162 Md. 84, 159 Atl. 106 (1932) ; *Texas Co. v. Wash., B. & A. R. Co.,* 147 Md. 167, 127 Atl. 752 (1925).

*Judgment affirmed; costs to be paid by appellants.*