Ruth Marie HEMPFLING by her father and next friend William C. Hempfling, and William C. Hempfling

v.

John W. PATTERSON.

Civ. A. No. 13841.

United States District Court
D. Maryland.
May 20, 1964.

Kenneth C. Proctor, R. Taylor, McLean, Proctor, Royston & Mueller, Towson, Md., of counsel, Thomas S. Jackson and Francis L. Young, Jr., Jackson & Gray, Washington, D. C., for plaintiffs.

Clater W. Smith, Herbert F. Murray and Phillip L. Goldsborough III, Baltimore, Md., for defendant.

WATKINS, District Judge.

This is a suit growing out of a collision of a sled with an automobile on February 14, 1960 on Crosby Road in Silver Spring, Montgomery County, Maryland. Jurisdiction is based upon diversity of citizenship, adequately alleged and proved as to diversity and amount. The plaintiffs are Ruth Marie Hempfling (Ruth) then aged nine and one-half years old, and William C. Hempfling (father) both citizens and residents of Maryland, and the defendant is John W. Patterson (defendant), a citizen and resident of the State of Oklahoma. Ruth, through her father, sues for physical injuries and pain and suffering, there being no claim of permanent disability except for slight operative and abrasion scars. The father sues for past medical expenses.

The case was tried before a jury. The defendant offered a request for a directed verdict at the end of plaintiff's case which was denied. An oral motion for a directed verdict was made at the end of the whole case, on which ruling was reserved by the court. The jury was unable to agree and was discharged. A timely motion under Rule 50(b), F.R. Civ.P., for verdict notwithstanding the disagreement of the jury was filed. Memoranda in support thereof and in opposition thereto were filed and oral argument was heard, supplemented by correspondence.

■■ The approach to such a motion has recently been set forth by the Court of Appeals for the Fourth Circuit in Beaty Shopping Center, Inc. v. The Mon-

arch Insurance Company of Ohio, 4 Cir. 1963, 315 F.2d 467, 469, where the court said:

\* \* \* \* \* \*

"In the federal courts, a mere scintilla of evidence is not sufficient to require the submission of an issue to the jury. Gunning v. Cooley, 281 U.S. 90 [50 S.Ct. 231, 74 L.Ed. 720 (1930)]; Mann v. Bowman Transportation, Inc., 300 F.2d 505 (4th Cir. 1962); Jones v. Traveler's Protection Association of America, 70 F.2d 74 (4th Cir., 1934); United States of America v. J. E. Bohannon Co., 232 F.2d 756 (6th Cir. 1956). But on a motion for directed verdict the evidence and inferences to be drawn therefrom must be considered in the light most favorable to the party against whom the motion is directed. Cranston Print Works Co. v. Public Service Co. of N. C., 291 F.2d 638 (4th Cir., 1961). If they are such that reasonable men might reach different conclusions thereon, the motion must be denied and the issues submitted to the jury. Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir.); cert. denied 363 U.S. 843 [80 S.Ct. 1608, 4 L.Ed.2d 1727], (1959)."

Fully appreciating the limitations so expressed, this court nevertheless has decided to grant defendant's motion. A review of the evidence will be required. Although in most areas there is no real conflict, when conflict occurs the version most favorable to plaintiffs will of course be stated.

Snow had fallen the night of Saturday, February 13, 1960, and the early morning of February 14th, to a depth of some six inches. A snow plow had been used on Crosby Road and Pin Oak Drive, the two streets involved. Whether this occurred before or after the snowfall had ceased is not clear, but in any event Crosby Road was icy and slick, and Pin Oak Drive was slippery, slick and the snow well packed.

Crosby Road runs roughly East and West, is approximately 27 feet wide, and is slightly upgrade at the points involved. Pin Oak Drive runs roughly north and south, is approximately 27 feet wide, with a substantial slope to Crosby Road, where it flattens out and dead ends. There is a stop sign at the corner of Crosby Road and Pin Oak Drive, controlling vehicular traffic using Pin Oak Drive. Ruth was familiar with this sign, and with its location.

Defendant had left his home to get some groceries. The automobile he was driving was not equipped with snow tires or chains, the regular tires having a better tread than defendant's snow tires.[1] He was proceeding at a rate of fifteen to twenty miles per hour westerly on his own side of Crosby Road, approaching Pin Oak Drive. He had had no difficulty in the operation or performance of the auto, and had observed no sledding, although children with, but not using, sleds were at an intersection to the east of Pin Oak Drive. When defendant was thirty to forty feet from Pin Oak Drive he saw Ruth on her sled up Pin Oak Drive the same or a greater distance.[2]

Defendant took "evasive action", applying the power brakes slowly at first, and finally sufficiently to cause a three foot skid mark, and pulled gradually to

---

1. No evidence was offered of any statutory authority requiring the use of chains or snow tires. Wiggins v. State, use of Collins, 1963, 232 Md. 228, 192 A.2d 515, decided on a completely different factual situation, is of no assistance to plaintiffs.

2. Ruth places herself at some 120 feet up Pin Oak Drive when she first saw defendant, who was then some 40 feet from the intersection. There is no absolutely necessary literal inconsistency between the testimony of Ruth and defendant, since each relates to conditions at the time the other was seen.

Defendant was called by plaintiffs as an adverse witness. His testimony, above recited, is more favorable to plaintiffs than is Ruth's, since it places the two closer together. Moreover, for Ruth on a sled to travel roughly three times as far as defendant's auto in the same time is highly improbable, to say the least.

the left.[3] Ruth on her sled came in contact with the right front side of defendant's auto, going underneath, her clothes catching on the right tie rod. Defendant's auto came to a stop within about a car length after the collision, having travelled a total of sixty to sixty-five feet, and ending up about two feet from the south side of Crosby Road, the front being about three feet east of the west line of Pin Oak Drive if extended. The auto was slightly angled, the front wheels turned to the left.[4]

Ruth, her brother and other children had started sledding around two o'clock in the afternoon. After a short series of runs down another road they moved over to Pin Oak Drive, and had been sledding between one and two hours when the accident occurred. The children started from different distances, Ruth usually beginning about one-half way up the hill. All the children would sled across Crosby Road, at first going over the south curb of Crosby Road and onto the lawn of Norman L. Arnold. Because he was afraid the sleds would strike the curb, and also to keep the children off his lawn, Arnold made available his driveway, which faced, but went beyond, the west line of Pin Oak Drive, and cleared the south one-third to stop the sleds. This condition had existed for an appreciable period of time before the accident.

Immediately upon Ruth and her brother having reached Pin Oak Drive, her father had taken a stand at the Arnold driveway, where he watched "unceasingly" until a few minutes before the accident, at which time he went into the Arnold basement for a cocktail to warm up. At that time Ruth was half way up Pin Oak Drive, and the father expected her to come down on her sled.

The reason the father had maintained his lookout was to look out for the coasting children, and to warn them, and the driver of an auto, if any was seen. No auto had passed during the period the father was watching.

Ruth's speed was five to seven miles per hour, or faster [5]; such a speed that it would be hard to stop [6]; "fast;" [7] moving "quite rapidly." [8]

Ruth's sled could be guided by bending the front of the runners, and in addition she could affect its, or her, progress, by sticking her foot out, or falling off.

When Ruth saw the approaching auto, she "froze" from fright; could not move or fall off; and "blacked out" when close to Crosby Road.

Defendant testified that when he saw Ruth, and defendant's brother testified that when he first saw the auto, each thought that there would be a collision between the auto and the sled. Such would seem to have been Ruth's impression also, in view of her "reactions."

Just how far east of Pin Oak Drive a good view of its roadbed could be obtained is not entirely clear, although the father testified that it could be done at seventy feet to the east.

### Discussion.

■ Defendant contends that Ruth's sled was a "vehicle" the operation of which was controlled by the stop sign (Annotated Code of Maryland, 1957 Edition, Article 66½, sections 233, 242); that Ruth was required to come to a stop before entering Crosby Road; and that her failure to do so was the proximate cause of her injury. Plaintiffs contend

3. The testimony of Ruth's brother that there was no change in speed or direction is contradicted by the undisputed physical facts, and was not relied upon by plaintiffs in argument.

4. This is substantially the father's testimony. The investigating officer referred to the auto as being at a "slight angle" in accordance with his diagram, which showed the angle to be roughly 45 degrees. Arnold, a rebuttal witness, had the auto parallel to the curb of Crosby Road. The defendant testified the auto stopped on a slight angle to the left.

5. Father's testimony.

6. Ruth's brother's testimony.

7. Ruth's testimony.

8. Defendant's testimony.

that Ruth's sled was not a "vehicle" controlled by the stop sign. Plaintiffs do not contend that Ruth was a pedestrian. Even if she were, she would have had no right of way, since there were no marked cross walks on Crosby Road; and there being no sidewalks on Pin Oak Drive, there could of course be no prolongation thereof. (Article 66½, section 2(a) (9)).

The potentially relevant provisions of Article 66½ of the Maryland Code of Public General Laws are:

Section 2: (Definitions)

"(27) Motor Vehicle. Every vehicle which is self-propelled except vehicles operated exclusively upon rails or propelled by electric power obtained from overhead wires, but not operated upon rails or tracks. * * *

"(60) Through Highway. Every highway or portion thereof at the entrances to which vehicular traffic from intersecting highways is required to stop and yield right of way before entering or crossing the same and when stop signs are erected as provided in this article. * * *

"(67) Vehicles. Every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, excepting devices used exclusively upon stationary rails or tracks or propelled by electric power obtained from overhead trolley wires, but not operated upon rails or tracks."

Section 233:

(a) "The driver of a *vehicle* shall come to a full stop as required by this article at the entrance to a through highway and shall yield the right of way to other vehicles approaching on said through highway." (Emphasis supplied).

(b) "The driver of a *vehicle* shall likewise come to a full stop in obedience to a stop sign and yield the right of way to a vehicle approaching on the intersecting highway as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway." (Emphasis supplied).

Section 242:

(c) "Every driver of a *vehicle* shall come to a full stop at such sign or at a clearly marked stop line before entering an intersection and yield the right of way to vehicles approaching on the intersecting highway except when directed to proceed by a peace officer or traffic-control signal." (Emphasis supplied).

The court has been referred to no Maryland case bearing upon the question of whether or not a sled is a "vehicle" within the laws relating to traffic. If, as would appear to be the case, the use of the broader word "vehicle" (rather than motor vehicle) is advertent in sections 233 and 242, a strong argument can be made that one riding in a wagon, or upon a sled or other gravity operated mechanism, is in or upon a device by which person or property may be transported, and is the driver of a "vehicle" required to come to a full stop at the entrance to a through highway or at a stop sign, and yield the right of way. Indeed, apart from the physical problem of how a stop is to be effected, the need for the complete stop by a brakeless vehicle is, if anything, greater than in the case of the ordinary "motor vehicle." [9]

If necessary, the court would be prepared to hold that in this case defendant

9. See the broad language in Fletcher v. Dixon, 107 Md. 420, 427, 68 A. 875, 878, and R. & L. Transfer Company v. State, 1931, 160 Md. 222, 153 A. 87, involving a coasting wagon, in which the court quoted with approval from a Pennsylvania

had the right of way. However, even if the rights of Ruth and the defendant were held to be equal (or identical) the court would still grant defendant's motion.

Plaintiffs offered requests for instructions involving the rules applicable to the last clear chance. Strictly, for this rule to come into play, there must first be primary and contributory negligence, after which the defendant, by the use of reasonable care with the then available facilities could, but fails to avoid injury to the plaintiff. Sears v. Baltimore & Ohio R. Co., 1959, 219 Md. 118, 125, 148 A.2d 366; State, use of Taylor v. Barlly, 1958, 216 Md. 94, 103, 140 A.2d 173; A.L.I. Restatement of Torts, section 479; see also McGowans v. Howard, 1964, 234 Md. 134, 138, 197 A.2d 915, 917–918. The cases have been rare in which in automobile accidents in Maryland the last clear chance has been held applicable, as the negligence of plaintiff and defendant has usually been found to be concurrent, and not sequential. Mumford v. United States, D.C., 1957, 150 F.Supp. 63, 67; West v. Belle Isle Cab Co., 1953, 203 Md. 244, 252, 100 A.2d 17; Fowler v. De Fortes, 1957, 211 Md. 568, 128 A.2d 395; Sears v. Baltimore & Ohio R. Co., 1959, 219 Md. 118, 148 A.2d 366; Dehn v. Matusak, 1960, 244 Md. 14, 165 A.2d 880; Alston v. Forsythe, 1961, 226 Md. 121, 125–126, 135, 172 A.2d 474; Creighton v. Ruark, 1962, 230 Md. 145, 150–152, 186 A.2d 208. However, from the standpoint of plaintiffs, the most that could be required of defendant, whether it be upon a last clear chance basis, or upon the obligation of any one observing another in a place of danger to use care, was the use of reasonable care with the facilities then available to him (supra) and in this case,

the condition not having been created or caused by the negligence of defendant, the test would be that of a reasonable man in an emergency. Baker v. Shettle, 1950, 194 Md. 666, 671, 72 A.2d 30; A.L.I. Restatement of Torts, section 296. In this connection, as in all cases involving the question of negligence " * * injuries which could by no reasonable possibility have been foreseen, and which no reasonably prudent person would have apprehended, cannot form the basis for actionable negligence. * * * the test of foreseeability, or reasonable anticipation as it is sometimes called, must be judged by foresight, not in retrospect." Aleshire v. State to Use of Dearstone, 1961, 225 Md. 355, 366, 367, 170 A.2d 758, 763, 764, quoted with approval in Ragonese v. Hilferty, 1963, 231 Md. 520, 191 A.2d 422.

In this case no *evidence* was offered as to what defendant could reasonably have done, other than what he did, after he became aware of Ruth's position of peril.[10] He stopped his auto within sixty five to seventy feet, or some four car lengths, having pulled over almost to the left curb. Plaintiffs argued that defendant might have jammed his brakes (probably causing loss of control) or swung sharply to the left (probably producing a spin). The reductio ad absurdum of second guessing is that, in the light of hindsight probably the best thing would have been for defendant not to apply his brakes, but instead to have accelerated his speed, in which case he probably would just have missed Ruth (or Ruth would have missed him). Had this been tried unsuccessfully, and the front or rear wheels had passed over Ruth, the plaintiffs might have argued, with greater plausibility, as to the rashness of this act.

case (Eastburn v. United States Express Co., 225 Pa. 33, 73 A. 977) stating the law applicable to sleds.

The decisions in other states are not helpful. See Annotations. 20 A.L.R. 1429, 1431; 109 A.L.R. 944.

10. Plaintiffs' reliance on cases such as Dorough v. Lockman, 1961, 224 Md. 168,

170, 167 A.2d 129, and State, use of Shipley v. Walker, 1962, 230 Md. 133, 186 A.2d 472, is misplaced. Dorough recognizes non-liability where a child suddenly darts into the road. In Shipley, the plaintiff, when observed, was already in the highway, and questions of lookout were properly present.

The absence of negligence on the part of defendant is of course dispositive of the father's suit. In addition, the conduct of the father would constitute contributory negligence on his part; or would corroborate, if not establish, absence of negligence on the part of defendant. The father had watched "unceasingly" until just before Ruth's final slide. Either (a) reasonable care on his part required continued vigilance to warn the coasting Ruth, and approaching vehicles, which warning would have been effective, the failure to continue such lookout being at least concurrent negligence on his part; or (b) if such a lookout, pursuant to which he could see Ruth and defendant long before each could see the other, would not have been adequate effectively to warn either or both, the failure of defendant sooner to see Ruth was not negligence, and/or the proximate cause of the accident.

The Clerk is directed to enter judgment for the defendant, pursuant to Rule 50(b), F.R.C.P.