## YELLOW CAB COMPANY, ET AL. *v.* GRETCHEN E. BISASKY (Widow of Louis C. Bisasky)

[No. 308, September Term, 1970.]

*Decided March 30, 1971.*

---

492

The cause was argued before MURPHY, C.J., and ANDERSON and THOMPSON, JJ.

*Allen Rabineau,* with whom was *Matthew Swerdloff* on the brief, for appellants.

*Jesse Spector* for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Louis Bisasky, a fifty year old taxicab driver, was held up at gun point by two passengers while operating his cab at 2:30 a.m. on July 28, 1965. During the course of the robbery, a gun was pressed against his head and one of the robbers threatened to kill him. After the robbery, Bisasky went to the police station and afterwards returned home, arriving at about 6:00 a.m. in a highly agitated state. At 8:00 p.m. the same day—some eighteen hours after the robbery — Bisasky suddenly fell to the floor while in his home, the victim of a stroke. He was taken by ambulance to Union Memorial Hospital where he remained until August 15, 1965 under the care of Dr. Alfred Ossman. Bisasky was thereafter unable to work. He suffered another stroke in June of 1967 and was hospitalized for three weeks at St. Joseph's Hospital. He suffered a third stroke on January 7, 1968 and was again hospitalized at St. Joseph's. On February 28, 1968, Bisasky was transferred to the Veterans Administration Hospital, where he died on March 8, 1968.

The employer and insurer, appellants herein, contested the Workmen's Compensation claim made on Bisasky's behalf for payment of medical expenses, and for temporary total and permanent total disability benefits. Appellants filed as issues in the case before the Workmen's Compensation Commission (1) whether Bisasky sustained an accidental personal injury arising out of and in the course of his employment, and (2) whether the disability was the result of a compensable injury. At a hearing held on July 15, 1969, Bisasky's surviving widow, ap

pellee herein, orally requested permission to raise the additional issues of nature and extent of disability and payment for medical expenses. Appellants objected to the inclusion of these additional issues at the hearing. The Commission indicated that it would not consider the nature and extent of disability "at this time." The hearing was eventually continued to obtain the testimony of medical witnesses, the Commission advising appellee that she could file other issues in the case. As a result, appellee formally raised as issues (a) the duration of Bisasky's temporary total disability, (b) whether he was permanently and totally disabled prior to his death, and (c) payment for medical expenses. Appellants raised an additional issue concerning the applicability of the statute of limitations. The hearing was resumed on November 26, 1969, at which time Dr. James Frenkil and Dr. Joseph Palmisano testified on appellee's behalf, while Dr. Israel Weiner and Dr. Alfred Ossman testified on appellants' behalf.

Based on the issues before it, the Commission found that Bisasky sustained an accidental personal injury arising out of and in the course of his employment; that as a result thereof he was temporarily totally disabled from July 28, 1965 to May 1, 1966; that he was thereafter permanently totally disabled prior to his death; that the appellants were liable for all medical expenses as a result of the compensable injury; and that limitations were not applicable.

Appealing from the Commission's decision to the Baltimore City Court, appellants presented the same issues as had been formally raised before the Commission, except for that pertaining to the statute of limitations. The appellants' position was that Bisasky suffered a cerebral vascular accident in 1965 which was thrombotic in nature and in no way related to the holdup. Appellee's position was that Bisasky suffered a cerebral hemorrhage in 1965, the competent producing cause of which was the emotional stress precipitated by the holdup. Appellants took the further position that no matter what the nature

of Bisasky's cerebral vascular accident, his injury was not "accidental" within the meaning of the Workmen's Compensation Law.[1]

At the trial before a jury, appellants put in evidence the Union Memorial Hospital records covering Bisasky's 1965 admission, after which they called Dr. Israel Weiner, a neurosurgeon, as an expert medical witness. Dr. Weiner had never treated Bisasky; his testimony was based on a review of the Union Memorial Hospital records. He noted the impression in the hospital record that Bisasky suffered a cerebral vascular accident, "probably thrombotic in nature." He found this diagnosis supported by the fact that there was no bleeding in the fluid taken by a spinal tap done on July 28, 1965. Such a finding, Dr. Weiner testified, "tends to indicate that the stroke is not on the basis of a cerebral hemorrhage." It was Dr. Weiner's opinion, based on reasonable medical certainty, that Bisasky's cerebral vascular accident "was caused by changes in the blood vessels of the type of hardening of the arteries, which is arteriosclerosis"; and that the stroke was wholly unrelated to the robbery.

Dr. Alfred Ossman, an internist who had treated Bisasky during his hospitalization at Union Memorial, testified for appellants that Bisasky suffered a cerebral vascular thrombosis in 1965; that the emotional stress of the robbery did not cause the stroke, and that it was purely coincidental that the stroke occurred shortly after Bisasky had been robbed. Dr. Ossman based his opinion, in part, upon the fact that no blood was found in the spinal fluid taken from Bisasky on July 28, 1965. Dr. Ossman, like Dr. Weiner, conceded the possibility that a hemorrhage could have occurred without blood being found in the spinal fluid.

Both medical witnesses testifying for appellants made reference to Bisasky's subsequent hospitalizations at St. Joseph's Hospital and testified with respect thereto.

At the conclusion of appellants' case, appellee intro-

---

1. See Maryland Code, Article 101, Section 15.

duced over objection the records of Bisasky's second and third admissions to St. Joseph's Hospital, after which she read into evidence, again over objection, the testimony of Dr. James Frenkil given before the Workmen's Compensation Commission. Dr. Frenkil, a specialist in industrial and occupational medicine for twenty-five years, had never treated Bisasky. He had, however, examined Bisasky's Union Memorial Hospital records and, based on a hypothetical question put to him, answered over appellants' objection that the emotional occurrence of the holdup "probably precipitated the cerebral vascular accident that occurred within the same day." Dr. Frenkil characterized Dr. Ossman's findings as "a good interpretation," and said that while he didn't know, "probably" no hemorrhage was involved because the spinal fluid was negative for blood. He did not agree, however, that emotional stress played no part in precipitating the stroke; he thought "it had a relationship to it." Considering the clinical picture as a whole, Dr. Frenkil said that he could not say whether Bisasky had a thrombosis; that he could have had an embolism or a ruptured aneurysm; and that he could have had a hemorrhage without any spread into the cerebral fluid. Asked on cross-examination how emotional upset could cause a thrombosis, Dr. Frenkil testified that with a sudden and severe emotional reaction, there is an increase in the adrenalin in the system which causes changes in the vascular activity, *i.e.*, contractions or expansions of blood vessels. Dr. Frenkil restated his belief, which he said was based upon reasonable medical certainty, that there was a relationship between the stroke and the robbery because of the closeness of the two events. He concluded his testimony by saying:

"I think there was, there is some relationship. I don't think I'm the Almighty. It's my guess."

The testimony of Dr. Joseph Palmisano, taken during the hearing before the Commission, was also read into evidence as part of appellee's case. Dr. Palmisano, a gen-

eral practitioner for fifteen years, had treated Bisasky for seven years prior to his first stroke; he did not treat Bisasky during his hospitalization in 1965 because he was out of the City at the time. He testified that Bisasky was in generally good health prior to his stroke; that while Dr. Ossman had concluded that Bisasky's stroke was "probably thrombotic," the symptoms of a cerebral vascular accident, whether thrombosis or hemorrhage, were very much alike and that because of this, it was customary to use the term "probably" in referring to the cause. The witness stated that he could never be certain as to the cause of a cerebral vascular accident unless an autopsy was performed. Based on reasonable medical certainty, Dr. Palmisano testified that it was "entirely feasible" that the emotional stress of the holdup caused Bisasky's stroke; that by his use of the term "entirely feasible" he meant "it's possible"; that the diagnosis of a cerebral vascular accident involved "a matter of clues"; that a hemorrhage had a sudden onset while a thrombosis had a slow onset; that as Bisasky's stroke was sudden, he believed it "entirely feasible" that it was a hemorrhage and not a thrombosis. He said:

> "* * * it's conceivable that his blood pressure could have risen high enough to leak into an artery. And then later on that day it would rupture and cause a cerebral vascular accident."

Dr. Palmisano stated that a cerebral vascular accident may be of the hemorrhage type without a positive showing of blood in the spinal fluid; that Bisasky's second stroke was diagnosed as an "inter-cerebral hemorrhage, hemorrhage with hypertension"; that the St. Joseph's Hospital records for the second stroke showed a positive (for blood) spinal fluid; that the records of Bisasky's third hospitalization showed that he had convulsions which "almost always goes along with hemorrhage"; that Bisasky's second stroke was "very probably" hemorrhage and the third "almost certainly" hemorrhage;

and that because strokes are usually extensions of each other, the first stroke could also have been a hemorrhage.

The St. Joseph's Hospital records showed a diagnosis, as to the third stroke, of "cerebral vascular accident hemorrhage." The diagnosis shown by the Veteran's Administration Hospital records was "middle cerebral artery thrombosis, bilateral."

At the conclusion of the evidence, the court gave detailed instructions to the jury. It said that the "focal point" of the case concerned the type of stroke suffered by Bisasky shortly after the robbery; that for the jury to determine whether the stroke was "accidental" required it to determine what type it was; that the medical evidence adduced by appellants was that the stroke was a thrombosis and if this was believed the stroke had no connection with the robbery; that the medical evidence adduced by the appellee was that Bisasky's stroke was of the hemorrhage type and was caused by the excitement of the holdup; that if this was believed by the jury, then Bisasky's stroke was "accidental" under the Workmen's Compensation Law. Appellants took no exception to these instructions. The jury found in appellee's favor on all issues.

## I

Appellants claim that they were denied due process of law because the Workmen's Compensation Commission failed to limit the issues decided by it to those initially raised by them and that, consequently, on appeal, the lower court erred in denying their pretrial motion to limit appellee's opening argument, and the introduction of evidence, to that alone relevant to those issues, namely, (1) whether Bisasky had sustained an accidental injury arising out of and in the course of his employment, and (2) whether his disability was the result of a compensable accident. Appellants contend that both of these issues involve only the period of Bisasky's first hospitalization at Union Memorial (from July 28, 1965 to August 15, 1965) and that had the hearing been limited to those is-

sues, no evidence relating to Bisasky's subsequent hospitalizations would have been admissible. In effect, appellants assert a right to limit the issues before the Commission and, on appeal from the Commission's decision, to exclude from consideration the issues of extent and nature of any temporary total or permanent total disability sustained by Bisasky prior to his death. To support their position, appellants place total reliance upon *Bayshore Industries, Inc. v. Ziats,* 229 Md. 69. We find no merit in their contention.

The issues formally presented to the Commission for adjudication were ultimately five in number, as previously outlined. Evidence pertaining thereto was adduced before the Commission and the Commission decided all issues before it. The issues framed by appellants on appeal were four in number, also as previously outlined. They included those which they now claim should not have been heard either by the Commission or on the appeal. But nothing in *Bayshore Industries* supports appellants' argument. In that case, the Commission ignored a stipulation between counsel to limit the issues at the hearing before the Commission. The Court of Appeals deemed it necessary to give force to that agreement in order to protect the parties' constitutional right to adequate notice of the issues to be determined. No such stipulation was involved in the present case. Indeed, it is perfectly clear that all issues were formally before the Commission; that the Commission considered and decided them; and that appellants were not surprised or afforded inadequate opportunity to meet such issues. Under these circumstances, we find no error in the lower court's denial of appellant's pretrial motion to limit the issues for decision.

## II

Appellants next claim that the trial court erred in receiving in evidence, over their objection, the St. Joseph's Hospital records relating to Bisasky's hospitalizations subsequent to his hospitalization at Union Memorial.

They claim that at the time the records were admitted, no proper foundation had been laid; that the authenticity of the records had not been established; that at most only that part of such records pathologically germane to the issues presented in the case would be admissible; and that in any event the records were not relevant to the issues in the case. Appellants claim that to permit such records in evidence was to improperly enable appellee to attempt to causally connect the first hospitalization at Union Memorial with the later St. Joseph's admissions and to make all appear connected with the holdup. They seemingly claim that to place evidence before the jury of the three periods of hospitalization was prejudicial, particularly since it showed an unbroken chain of hospital admissions which culminated in Bisasky's death. We see no merit in the contention.

When appellee sought to introduce the St. Joseph's Hospital records in evidence, appellants objected on the ground that "it is inconsistent with the same matter discussed in chambers prior to the presentation of the case before the jury." In overruling the objection, the trial judge noted that the hospital records were not involved in such discussion. While we have no way of knowing the actual basis of appellants' objection, we surmise that it related to their effort to limit the issues in the case, as heretofore discussed. At best, this objection went to the relevance of the records and not to their authenticity. We think the records had some relevance; indeed, all the medical experts in the case made mention of Bisasky's subsequent hospitalizations, and Dr. Palmisano in particular predicated his opinion, in part, upon the nature of the second and third strokes suffered by Bisasky. That appellants themselves introduced the records of the Veterans Administration Hospital into evidence tends to fortify the conclusion that the records were a relevant source of medical evidence. We see no error in their admission or use.

### III

Appellants complain that the trial court committed er-

ror when it overruled their objection to a hypothetical question asked Dr. Frenkil regarding the causal connection between the robbery and the stroke. They claim the question failed to embrace every material fact in evidence essential to the formulation of a rational opinion and, in particular, failed to refer to the objective findings contained in the Union Memorial Hospital records, including the absence of headaches and unconsciousness, of the finding of a normal spinal fluid, of the prompt improvement in the blood pressure, and the absence of any reference to any of Bisasky's activities between the robbery and the stroke some eighteen hours later.

A hypothetical question need contain only a fair summary of the material facts in evidence essential to the formulation of a rational opinion concerning the matter to which it relates. *Stumpf v. State Farm Mutual,* 252 Md. 696; *Commercial Transfer Co. v. Quasny,* 245 Md. 572; *Wolfinger v. Frey,* 223 Md. 184. Whether the question meets that test is a matter generally committed to the sound discretion of the trial court. *Williams v. Dawidowicz,* 209 Md. 77; *Quimby v. Greenhawk,* 166 Md. 335.

Prior to being asked the challenged hypothetical question, Dr. Frenkil testified concerning his familiarity with and review of the Union Memorial Hospital records and differentiated between the various types of cerebral vascular accidents. While appellants correctly state that the hypothetical question asked Dr. Frenkil did not specifically incorporate the objective findings contained in the hospital records, we do not view that omission as fatal in this case. We think the hypothetical question was of the "bare bone" variety but that it contained a legally sufficient hypothesis permitting Dr. Frenkil to render a rational medical opinion that the emotion generated by the holdup "probably" precipitated the stroke suffered by Bisasky soon thereafter. *Compare Wolfinger v. Frey, supra,* and *Commercial Transfer Co. v. Quasny, supra.*

## IV

Appellants contend that the trial court erred in permitting their cross-examination of Dr. Frenkil and Dr. Palmisano, as recorded before the Workmen's Compensation Commission, to be received in evidence over their objection as part of the appellee's case. They rely on *Savage Mfg. Co. v. Magne*, 154 Md. 46.

In *Savage*, the claimant, who had prevailed before the Commission, was permited to read into evidence at the trial on appeal, over objection, both the testimony adduced by her before the Commission, as well as that there adduced by the employer and insurer. The Court of Appeals noted the existence of a common practice "to read as evidence, on trials of appeals from the Commission, the testimony before it." It commended the practice as "the most convenient and inexpensive method of proving the material facts" because it obviated "the cost and possible delay involved in securing again the attendance of witnesses who have already testified upon the issues to be determined." It noted the provision of the Workmen's Compensation Act that proceedings on appeal from the Commission "shall be informal and summary" (see Maryland Code, Article 101, Section 56), and that the purpose of such provision was to insure "the most simple, speedy, and economical procedure consistent with the practical ends of justice"; that such method of proof "accords with the spirit of the statute while permitting a full and fair trial on the merits." The court held, however, that the lower court erred when it permitted counsel for the claimant, over objection, "to read to the jury not only the testimony offered by her before the Commission but also that introduced by the employer and insurer * * * as the parties should be allowed to determine for themselves whether to use on appeal the transcript of testimony which they, respectively, produced before the Commission, or to support their claim or defense by witnesses called in court for that purpose." At page 52.

Unlike *Savage*, appellee did not introduce testimony ad-

duced by the appellants as part of their case. We think the evidence given before the Commission by appellee's witnesses, whether on direct or cross-examination, must be viewed as part of appellee's case for purposes of applying the rationale underlying the *Savage* rule. To interpret the *Savage* rule in a manner that would require technical dissection of the testimony of a witness who appeared before the Commission—admitting the direct but denying the cross-examination, admitting the redirect but denying the recross-examination—is to defeat the legislative mandate embodied in Section 56 of Article 101 that appeal proceedings shall be "informal and summary." We thus conclude that the trial judge did not err in permitting the cross-examination of appellee's medical witnesses to be read to the jury.

## V

Appellants next claim that the trial court erred in denying their motion to strike all Dr. Frenkil's testimony on the ground that it was not based on reasonable medical certainty, but was "mere conjecture or guess work." They point out that at one point in his testimony, Dr. Frenkil stated that his opinion was based on reasonable medical certainty, while he said another time that it was his "guess" that there was a relationship between the stroke and the holdup. Appellants claim that the jury was thus erroneously permitted to speculate as to which version of the witness's testimony was true.

In workmen's compensation cases, proximate cause means that the result could have been caused by the accident and no other efficient cause intervened between the accident and the injury. *Baughman Co. v. Mellott,* 216 Md. 278; *Reeves Motor Co. v. Reeves,* 204 Md. 576. Of course, such possibility must amount to more than a guess, and the relation of the accident to the condition complained of, in point of time and circumstance, must be not merely fanciful. *Moller Motor Car Co. v. Unger,* 166 Md. 198; *Baber v. Knipp & Sons,* 164 Md. 55. But a medical expert is not barred from expressing an opin-

ion as to the cause of an injury merely because he is not willing to state it with absolute certainty; his opinion is admissible "as to the cause which produced, or probably produced, or might have produced, a certain physical condition." *Bethlehem Shipyard v. Scherpenisse*, 187 Md. 375, 380. *See also Langenfelder v. Thompson*, 179 Md. 502, 507, wherein the court said: "The opinion of an expert as to the probability, or even the possibility, of the cause of a certain condition may frequently be of aid to the Jury; for when the facts tend to show that an accident was the cause of the condition, the assurance of an expert that the causal connection is scientifically possible may be helpful in determining what are reasonable inferences to be drawn from the facts." [2]

Considering Dr. Frenkil's testimony in its entirety in light of these principles, we think it was properly submitted to the jury for its consideration. The gist of his testimony was that the emotional stress of the robbery might have or probably produced the stroke, although he could not be certain. His testimony that he believed there was a relationship, and that this belief was based on reasonable medical certainty, is not to be abrogated by an isolated statement, considered out of context, that it was his "guess" that there was such a connection. It is readily apparent to us that in the context in which Dr. Frenkil used the word "guess," he intended, at most, to convey the thought that he could not be absolutely certain; that only the Almighty knew for certain. We thus conclude that as Dr. Frenkil's testimony was not based upon mere possibilities, it was admissible, its weight being for the jury. *Compare Ranson v. Funkhouser*, 258 Md. 346; *Dayton v. Davis*, 218 Md. 614; *Baughman Co. v. Mellott, supra.*

---

2. As to the proximate cause of any injury, the law requires proof of probable, not merely possible facts, including causal relation; but sequence of events, plus proof of possible causal relation, may amount to proof of probable causal relation, in the absence of any other equally probable cause. *Hughes v. Carter*, 236 Md. 484; *Paul Construction Co. v. Powell*, 200 Md. 168; *Charlton Bros. Co. v. Garrettson*, 188 Md. 85.

## VI

Appellants also claim that the trial court erred in denying their motion to strike all of Dr. Palmisano's testimony on the ground that he failed in any manner to causally connect the cerebral vascular accident with the holdup. They refer to the doctor's testimony that it was "entirely feasible," *i.e.*, that it was "possible," that there was such a connection.

Considering Dr. Palmisano's testimony in its entirety, we think it was properly submitted to the jury for its consideration. The thrust of his testimony was that in the absence of an autopsy no one could be certain whether Bisasky's stroke was thrombotic in nature or a hemorrhage; that based on reasonable medical certainty, he believed Bisasky's stroke might have been caused by hemorrhage and might have been precipitated by the emotional stress of the holdup. We are persuaded that Dr. Palmisano's testimony, viewed in its entirety, was not based on mere possibilities; its weight was for the jury.[3]

## VII

Finally, appellants complain that the trial court erred in denying their motion for a directed verdict made at the end of the entire case because (a) there was no legally sufficient evidence of a causal connection between the stroke and the holdup, and (b) an emotional shock, even though it be a sudden, unforeseen event, cannot constitute an accident unless such event causes or is causative of a personal injury.

Where there is any evidence from which a rational conclusion may be drawn, as opposed to the theory of the prayer for a directed verdict, the weight and value of such evidence should be left for the consideration of the jury, and before such a prayer can be granted, the court must assume the truth of all the evidence tending to sustain the claim and all inferences of fact fairly deducible

---

3. We find no merit in appellants' argument that reversible error was committed by the trial judge in permitting appellee's witnesses to answer leading questions.

from it. *Superior Builders, Inc. v. Brown*, 208 Md. 539. As heretofore indicated, we think there was legally sufficient evidence to carry the case to the jury on the question of the causal relation between the robbery and the stroke.

The term "accidental personal injury" within the meaning of the Workmen's Compensation Law, Maryland Code, Article 101, Section 15, includes any mischance resulting in physical injury to the bodily tissues produced by some unusual and extraordinary condition or happening in the employment; it has been interpreted to include such an untoward occurrence as a cerebral hemorrhage where it arises out of some unusual or extraordinary condition in the employment. *Schemmel v. Gatch & Sons*, 164 Md. 671. In other words, where a cerebral hemorrhage is proximately caused by some unusual strain or exertion of the employee or some unusual condition in the employment it assumes the character of an "accidental personal injury" under the Workmen's Compensation Law. *See Kelly-Springfield Co. v. Daniels*, 199 Md. 156. In *Geipe, Inc. v. Collett*, 172 Md. 165, involving disability resulting from a cerebral hemorrhage suffered by the claimant during the course of his employment, the court, in approving an award of compensation benefits, held "that an accidental personal injury takes place if the injury be a nervous shock that produces not a mere emotional impulse but a physiological injury as the proximate effect of an unforeseen or unexpected event, which occurs without design in the reasonable performance of the employee's duties." At page 171. To like effect, see *Moller Motor Car Co. v. Unger, supra; State Roads Commission v. Reynolds*, 164 Md. 539.

To be robbed at gun point in the dead of night and, gun against head, threatened with death, while no longer a rare experience, is nevertheless an unusual happening in the employment of a cab driver. If the cerebral vascular accident suffered by Bisasky resulted from that frightening experience, as found by the jury, we believe his injury constituted an "accident" within the coverage of the

508

Act. *Compare Whiting-Turner Contracting Co. v. Mc-Laughlin*, 11 Md. App. 360.

*Judgment affirmed; appellants
to pay costs.*