## THE SHEET METAL COATING AND LITHO CORPORATION ET AL. *v.* GENEVIEVE MAXWELL, WIDOW, ETC.

[No. 159, September Term, 1973.]

*Decided January 3, 1974.*

The cause was argued before THOMPSON, POWERS and MENCHINE, JJ.

*Raymond A. Richards*, with whom were *Rollins, Smalkin, Weston & Andrew* on the brief, for appellants.

*John H. Hirsch* for appellee.

MENCHINE, J., delivered the opinion of the Court.

Norman Francis Maxwell sustained an accidental injury arising out of and in the course of his employment by The Sheet Metal Coating and Litho Corporation. The injury consisted of a very severe comminuted fracture of the right lower leg, requiring hospitalization for an open reduction. Routinely granted compensation benefits by the Workmen's Compensation Commission for temporary total disability Maxwell, before the hearing to determine the extent of his permanent disability, suffered a heart attack. Such a hearing was had on May 23, 1972. Maxwell's contention that he was permanently totally disabled as a consequence of his accidental injury was rejected by the Commission. On July 11, 1972 the Commission awarded benefits for permanent partial disability for 65% loss of use of his right foot. Maxwell appealed. Prior to trial on appeal the claimant died and his wife was substituted for him by order of court.

The appeal was tried before a jury in the Baltimore City Court upon multiple issues but with only one issue involved here, namely:

"Was the Claimant permanently totally disabled at

the time of the Commission's award of July 11, 1972 as a result of the accidental injury on May 8, 1970?"

The jury answered the issue "Yes."

The employer and insurer have appealed and present for our decision the following questions:

"1.  Is there legally sufficient evidence to support a finding that, prior to his heart attack, the Plaintiff's decedent was permanently and totally disabled as a result of the injury to his ankle?

2.  Is there legally sufficient evidence to support a finding that the heart attack suffered by the Plaintiff's decedent was the result of accidental injury in the course of his employment?"

Because the medical and lay testimony required to be considered by us bears upon both issues, we shall consider them together.

Dr. Lippman, who examined Maxwell shortly before the hearing at the Commission, testifed in part as follows:

> "* * * this man sustained an injury on May 28, 1970, which caused him to have an inability to use his leg; following fracturing he was not able to return to work, and he remained with the permanent disability.
>
> * * *
>
> Q   Can you state with a reasonable degree of medical certainty what effect this injury had upon the man's body?
>
> A   It caused him to be totally permanently disabled."

It is true that Dr. Lippman conceded that his evaluation of the man's condition was based on his overall condition (including a heart attack and gall bladder surgery). That concession, however, was of a decidedly limited nature because Dr. Lippman on redirect examination gave the following testimony:

"We rated this man and we rated him as total permanent. In answer to both questions, the man had a severe type fracturing of his leg and he wasn't able to move around so that he was able to function in the proper fashion. He was not re-employable; re-employment was based on the leg and so on.

Q    Isn't it true, Dr. Lippman, that the combination of the heart attack and the leg brought about your final evaluation?

A    Well, it could have entered into it at the time that I was seeing him, but by the same token we rated him basically as an orthopedic problem."

Dr. O'Herlihy, a specialist in internal medicine, also testified in behalf of the claimant. His testimony included the following:

"Q    * * * You say that in your opinion that this [heart attack] was a 50 percent chance that this occurred as a result of the accident; is that what you are saying?

A    As a result of the way that he reacted over the preceding year as a result of the accident, yes.

Q    Now, as I understand it, are you stating in effect that there was an aggravation of a preexisting condition?

A    I would say that a patient who presents with acute coronary insufficiency or evidence of heart disease such as he had undoubtedly had to have underlying heart disease that was asymptomatic over the one or two preceding years."

And later

"Q    I see. Now, can you state with a reasonable degree of certainty whether the accident of May 28th, 1970, had any effect upon the

condition that you found with his permanent total disability.

\* \* \*

A   Yes.

Q   You can state that?

A   I can state it."

And again

"Q   Now, I go back and ask you — I asked you if you could state with a reasonable degree of medical certainty whether or not the accident of May 28, 1970, had any effect on his heart condition, you said, 'yes.' I am now asking what effect it had on his heart condition?

A   Anybody recovering from any acute cardiac problem who has an underlying condition that is constantly aggravating this man, his cardiac problem is being adversely affected by this underlying condition.

Q   In Mr. Norman Maxwell's condition was his cardiac condition affected by the underlying condition of the leg?

A   I believe so.

\* \* \*

Q   As a matter of fact, even if he had not had the fracture of the right leg he would have still been permanently and totally disabled solely from the heart?

\* \* \*

A   No, I don't think so.

\* \* \*

Q   Sure. You have any knowledge from your examination of Mr. Maxwell, from hospital records, or any information coming from any source whether Mr. Maxwell had a permanent impairment due to a previous accident, disease, or congenital condition which is or is likely to

be a hindrance to his employment when you first saw him?

A   Yes.

Q   What is that?

A   I felt that the right foot lesion was certainly a hindrance and prevented him from working."

The testimony given by the injured workman before the Commission was read into the record at the trial below. That testimony included the following:

"Q   Since this accident, have you been back to work?

A   No. I haven't been able to do nothing.

* * *

Q   All right. Now, you mentioned that you cannot walk for more than a block. What other problems, if any, do you have with your right leg and ankle?

A   Well, the problem is that I have to force my body to do so much that I'm exhausted all over. I mean physically I am exhausted from pushing myself to try to make my ankle do what I want it to do. It won't respond.

Q   Well, you say you can't walk for more than two blocks. Why can't you walk for more than two blocks?

A   It physically won't let me. I'm just exhausted. I get pains.

Q   Where did you get the pains?

A   My ankle, it swells and mornings when I get up, I have to sit on the side of the bed and let myself stabilize there for a while before I can even go to the bathroom. I have to sit around the house. It swells. I have to prop it up in order to take the strain and the pain off of it. I can't do anything with it.

* * *

Q    And subsequent to that time, is it true that the reason you are afraid to over tax yourself or play golf is because you have had an intervening heart attack?

A    I had a heart attack after my accident.

Q    Right. Isn't that what stopped you from getting around now?

A    The heart attack, I think, came, personally, from my injury of trying to walk around the block and everything."

Mrs. Maxwell, wife of the injured workman, testified that after the injury and before the heart attack, Maxwell was able to walk only 70 feet and then "his foot would hurt him, it would swell * * *. No matter what he did he had to sit and bathe it and prop it up after he had his cast off. * * * He never drove the car again * * * His foot swelled when he put it on the floor and it would ache him * * * That was from the date of the accident * * * until the date of his death."

Marilyn Goodrich, daughter of Maxwell, gave the following testimony:

"Q    What was his condition as you observed it from the date of this accident up until the time of his heart attack, April 21st, I believe, 1971?

A    My father was a sad man. To see him it really was a major change in him. He couldn't do anything, he couldn't get around, he couldn't hardly get out of bed, he couldn't walk. It was tearing him up emotionally, as well as, physically. He was really just awful. His leg would swell, and it would turn blue, and he would have to prop it up. We'd go down the house to visit mom and dad and the children. Sitting there with his leg propped up, and that's is where he would stay until we would leave or else he would be in bed. My father didn't get around hardly at all. When he went to the doctor's, my mother had to take him to and from the wheel chair."

She added that around April, 1971, her husband and her father "walked to the corner, almost made it, and they couldn't quite make it.

Q  How far is the corner?
A  Well, he didn't make it to the corner. He only got, I guess, about a hundred feet from the house and then they had to turn around and come back, and he was paining and draging [sic] his leg, and of course, my husband was helping him, and it was quite emotional."

We find the cases of *Mureddu v. Gentile*, 233 Md. 216, 196 A. 2d 82; *Atlas General Industries Inc. v. Phippin*, 236 Md. 81, 202 A. 2d 767, and *Yellow Cab Company v. Bisasky*, 11 Md. App. 491, 275 A. 2d 193 to be wholly dispositive of the issues presented here.

In *Mureddu v. Gentile, supra*, the Court of Appeals said at page 220 [84]:

"The question before us is not whether we might have concluded that she was capable of doing some sedentary work, but is whether there was evidence from which the jury could reach a contrary conclusion. We are unable to say that there was not such evidence. The jury could, we think, on the basis of the claimant's own testimony and on the medical evidence, reach the conclusion that because of her injury and the continuing pain resulting therefrom she could not engage in even sedentary employment.

The appellants' second contention is that, even if the claimant be entitled to any compensation, it is limited to the scheduled benefit for the partial loss of use of her leg."

adding at page 224 [86]

"There is nothing in our statute which says that a scheduled loss necessarily involves only partial permanent disability. The reasoning of *Congoleum Nairn*, we think, makes it clear that a scheduled loss may support an award for total permanent

disability, under Sec. 36 (1) of the Act, if the evidence is sufficient to show total permanent disability in fact."

In *Atlas, supra,* the Court of Appeals said at page 88 [770]:

"The jury was entitled to consider the testimony of the claimant and of his physician (*Mureddu v. Gentile,* 233 Md. 216, 220, 196 A. 2d 82), and the testimony was sufficient to meet the test of proximate causation under the Workmen's Compensation Act recognized in this State 'that the result could have been caused by the accident and no other efficient cause has intervened between the accident and the result.' *Baber v. Knipp & Sons,* 164 Md. 55, 67, 163 A. 862; *Moller Motor Car Co. v. Unger,* 166 Md. 198, 206, 170 A. 777; *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse,* 187 Md. 375, 385, 50 A. 2d 256; *Paul Construction Co. v. Powell,* 200 Md. 168, 185, 88 A. 2d 837; *Reeves Motor Co. v. Reeves,* 204 Md. 576, 581, 105 A. 2d 236 (rule stated, not found applicable); *Baughman Contracting Co. v. Mellott,* 216 Md. 278, 283, 139 A. 2d 852; *Bethlehem Steel Co. v. Jones,* 222 Md. 54, 58, 158 A. 2d 621. Since there was some medical testimony to support a causal connection between the accident and the injuries to the claimant's neck, shoulder and arm, we need not consider whether this was a case in which no medical testimony as to causation, in addition to lay testimony with regard thereto, would have been needed in order to take the case to the jury. We hold that the evidence was sufficient to warrant the submission to the jury of the question whether the injuries to the claimant's neck, arm and shoulder were caused by the accident."

In *Yellow Cab, supra,* this Court said at page 504 [201]:

"In workmen's compensation cases, proximate cause means that the result could have been caused

by the accident and no other efficient cause intervened between the accident and the injury. *Baughman Co. v. Mellott*, 216 Md. 278; *Reeves Motor Co. v. Reeves*, 204 Md. 576. Of course, such possibility must amount to more than a guess, and the relation of the accident to the condition complained of, in point of time and circumstance, must be not merely fanciful. *Moller Motor Car Co. v. Unger*, 166 Md. 198; *Baber v. Knipp & Sons*, 164 Md. 55. But a medical expert is not barred from expressing an opinion as to the cause of an injury merely because he is not willing to state it with absolute certainty; his opinion is admissible 'as to the cause which produced, or probably produced, or might have produced, a certain physical condition.' *Bethlehem Shipyard v. Scherpenisse*, 187 Md. 375, 380. *See also Langenfelder v. Thompson*, 179 Md. 502, 507, wherein the court said: 'The opinion of an expert as to the probability, or even the possibility, of the cause of a certain condition may frequently be of aid to the Jury; for when the facts tend to show that an accident was the cause of the condition, the assurance of an expert that the causal connection is scientifically possible may be helpful in determining what are reasonable inferences to be drawn from the facts.' "

Under those rules of law the evidence in the subject case would permit the jury to conclude (a) that Maxwell was permanently totally disabled prior to his heart attack; and (b) that the injury and its sequelae were causally related to the heart attack itself.

*Judgment affirmed.*
*Costs to be paid by appellants.*